**Affirmed and Opinion Filed August 28, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-14-00951-CV
_____

**D MAGAZINE PARTNERS, L.P. D/B/A D MAGAZINE, MAGAZINE LIMITED PARTNERS, L.P., AND ALLISON MEDIA, INC., Appellants**

**V.**

**JANAY BENDER ROSENTHAL, Appellee**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-01346-G**

## OPINION

Before Justices Francis, Myers, and Brown
Opinion by Justice Myers

D Magazine Partners, L.P. d/b/a D Magazine, Magazine Limited Partners, L.P., and Allison Media, Inc. appeal the trial court's denial of their motion under the Texas Citizens Participation Act ("TCPA") to dismiss Janay Bender Rosenthal's libel claim. Appellants bring three issues on appeal asserting (1) appellee did not meet her burden of establishing a prima facie case on each element of her libel claim by clear and specific evidence; (2) appellants established the essential elements of one or more affirmative defenses by a preponderance of the evidence; and (3) the case should be remanded for a determination of appellants' attorney's fees and costs. We affirm the trial court's order denying the motion to dismiss.

# BACKGROUND[1]

In May 2011, after years of divorce and child-custody proceedings against her former husband left her financially drained, appellee applied for government benefits under the Supplemental Nutritional Assistance Program ("SNAP"). The Texas Health and Human Services Commission ("HHSC") approved her application and paid her benefits under SNAP. In early 2012, appellee and her minor daughter were living with appellee's fiancé, who owned a home in Dallas near the City of University Park. The home was in the Highland Park Independent School District, and appellee's daughter attended public school in that district. Appellee continued to receive SNAP benefits while living with her fiancé. Appellee testified that while she was dating her fiancé, she was harassed by his ex-girlfriend. Appellee stated this woman had impersonated or gotten other persons to impersonate police and "disease control representatives" in attempts to ruin appellee's reputation.

In the March 2013 edition of D Magazine, appellants published an article about appellee. The article described appellee's government benefits, her change of address to her fiancé's house, property listed in her daughter's living trust, an affidavit of indigency, appellee's criminal record, and her spending at grocery stores using SNAP benefits. Appellee contends that the article accused her, wrongly, of having committed "welfare fraud." Following publication of the article, appellee's fiancé broke up with her. Appellee was shunned by her acquaintances, and she had difficulty obtaining employment. Appellee alleged that "[t]o this day, a search of [her name on the internet] pulls up numerous articles regarding welfare fraud."

After the article was published, appellee contacted HHSC, which administers SNAP in Texas, to find out if she had done anything wrong. A Deputy Inspector General told her HHSC

---

[1] This factual summary is drawn from the statements in the parties' pleadings and from the affidavits and attachments to appellants' motion to dismiss and appellee's response to the motion. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006 (West 2015).

had investigated the facts asserted in the article and "found no evidence anyone has fraudulently obtained or otherwise abused state benefits."

Appellee testified that recordings of telephone calls to HHSC from before the article was published showed a woman had called HHSC pretending to be appellee. This caller used appellee's social security number and date of birth to obtain information about appellee's SNAP benefits account and her spending of the benefits. Appellee stated she recognized the caller's voice as that of her fiancé's ex-girlfriend who had been harassing her.

Appellee, individually and as next friend of her daughter, filed suit against appellants, alleging causes of action for negligent defamation, libel per se, libel *per quod* with actual malice, and violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") and the Identity Theft Enforcement and Protection Act ("ITEPA"). *See* TEX. BUS. & COM. CODE ANN. §§ 17.41–.63 (West 2011 & Supp. 2014) (DTPA); *id.* §§ 521.001–.152 (West Supp. 2014) (ITEPA). Appellee requested actual and exemplary damages as well as an award of her attorney's fees. Appellants moved for dismissal under the TCPA. After a hearing, the trial court granted the motion to dismiss as to the DTPA and ITEPA causes of action and on all claims on behalf of appellee's daughter. The court denied the motion to dismiss as to appellee's claims on her own behalf for libel. The court stated in the order that "the Court finds that Plaintiff has established by clear and specific evidence a *prima facie* case of defamation."

**THE ARTICLE**

The article was mentioned on the upper-left corner of the magazine's cover as follows:

[CRIME]

## THE PARK CITIES
## WELFARE QUEEN PAGE 16

The article itself was one page. In the top left corner of the page was the word "pulse." Below that on the left side was a photograph of appellee with a towel around her neck and shoulders

taken by police in Collin County following her arrest for theft. Appellee's photograph was surrounded by an ornate gilded frame. The photograph had the caption, "Glamour shot: Janay Bender Rosenthal was arrested for theft in Collin County, where all mug shots are taken with a gray towel wrapped around the perp's neck." To the right of the photograph is the first part of the article:

[CRIME]

# THE PARK CITIES WELFARE QUEEN

One University Park mom has figured out how to get food stamps while living in the lap of luxury. By Anonymous Park Cities Parent

Who wouldn't like some extra spending money each month? Cash for those little treats at Whole Foods and Tom Thumb? Well, it can be yours with just a little effort. All you have to do is apply for food stamps. What's that, you say? You live in the Park Cities and would never qualify? Hogwash. Just have a look at how 40-year-old University Park mom Janay Bender Rosenthal pulls it off.

The rest of the article is set out in five columns, with the headings "1. Know the System," "2. Move in with Your Boyfriend," "3. Say You're Head of the Household," "4. Don't Lose Your Job," and "5. Commit Only Minor Crimes."

**1. Know the System**

When Rosenthal applied for funds from the Supplemental Nutritional Assistance Program (SNAP) sometime before 2011, she had to prove she qualified for welfare. Information about individuals receiving aid is not publicly available, so we can't say for sure what she told the Health and Human Services Commission (HHSC), which oversees the program. But public records indicate that Rosenthal must have been less than forthcoming when she renewed her application online in October 2012. Every six months, she has had to establish that she is still destitute. An HHSC Eligibility Department officer who would not provide his name confirmed that Rosenthal will receive $367 per month through April 2013. Assuming she has received that same benefit every month during the time she has been enrolled in SNAP, we figure she has received a cool $10,276.

**2. Move in with Your Boyfriend**

Rosenthal's current driver's license lists an old address on La Cabeza Drive, in Far North Dallas, a house within the boundaries of the district where she attended high school. The house is owned by a [R.B.]. According to an Eligibility

Department officer, it is the same address contained in the HHSC database and sworn to on an affidavit of indigency that Rosenthal filed in Dallas County District Court on August 7, 2012. (Falsifying such a document is a felony.) But on February 22, 2012, in a divorce proceeding, Rosenthal filed a document under oath stating that her address had changed from a location in Irving to one on Bryn Mawr Drive, in University Park. That same address is listed as her child's in a Highland Park ISD school directory. The 6,000-square-foot, five-bedroom UP house is on the tax rolls for $1.15 million.

### 3. Say You're Head of the Household

The Bryn Mawr house is owned by [M.Z.], President of a real estate and construction business . . . . He is the head of household because he owns and lives in the house. In a July 2012 police report, Rosenthal stated that [M.Z.] was her fiancé. In a recent Facebook photo, Rosenthal can be seen wearing a diamond ring on her left hand, fourth finger. The SNAP application requires that applicants include the name, address, phone number, and signature of any person who gives you gifts or pays your bills, and the amount of money the person brings "into the home." Rosenthal left this part blank, according to another HHSC officer. According to the Dallas Central Appraisal District, Rosenthal has a relationship to other households, too. Nine properties are listed in the name of her daughter's living trust.

### 4. Don't Lose Your Job

Especially if you are your own boss. To receive SNAP benefits, applicants must be employed or participating in a work program. They must show bank statements and either paychecks or self-employment records.[2] These documents are not required to renew benefits, just to get them started. According to Rosenthal's August affidavit of indigency, at the time she had just $60 in a bank account, $50 in cash, no jewelry, and a 10-year-old Suzuki valued at $3,000. The affidavit also shows that the box marked "unemployed" was checked but then scribbled out. Instead, the "self-employed" box was checked. Her October SNAP renewal lists $135 in a checking account, according to the HHSC eligibility department officer, and $35 in expenses for the Suzuki.

### 5. Commit only Minor Crimes

Public police records for Rosenthal show numerous theft-related arrests and convictions in North Texas. One arrest occurred at a Tom Thumb store where she routinely uses her Lone Star Card, the debit card that the state uses to distribute

---

[2] The internet version of the article included a footnote at this location stating:

*Correction: An earlier version of this story stated that HHSC checks income and resources records only when a person first applies for SNAP benefits, not when they renew. That was inaccurate. HHSC makes these checks when a client renews benefits, too, which generally happens every six months.

This footnote was not in the print version of the article.

SNAP funds. According to the HHSC eligibility department officer, on December 27, Rosenthal spent $43.50 at the East Lover's Lane Tom Thumb. On January 5, she spent $141.67 at the Preston/Royal Tom Thumb. (On January 7, she went more upscale, spending $23.19 in welfare money at the Whole Foods on Preston Road.) Interestingly, even if Rosenthal did report her run-ins with the law, the state still might award benefits. Stephanie Goodman, the HHSC director of communications, says, "We only check for felony drug convictions."

*The Park Cities Welfare Queen*, D MAGAZINE, Mar. 2013, at 16 (footnote added). Besides the printed copy of the article in the published magazine, the article was also available in electronic form on appellants' website through at least the day of the hearing on the motion to dismiss.

## CITIZENS PARTICIPATION ACT

The purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 (West 2015). Although we construe the TCPA liberally "to effectuate its purpose and intent fully," the act "does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions." *Id.* § 27.011.

The TCPA provides a mechanism for early dismissal of a cause of action that "is based on, relates to, or is in response to a party's exercise of the right of free speech, the right to petition, or right of association . . . ." *Id.* § 27.003. "'Exercise of the right of free speech' means a communication made in connection with a matter of public concern." *Id.* § 27.001(3). "'Communication' includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). "'Matter of public concern' includes an issue related to . . . (B) environmental, economic, or community well-being; . . . [or] (C) the government . . . ." *Id.* § 27.001(7).

The TCPA imposes the initial burden on the party moving for dismissal to establish by a preponderance of the evidence "that the legal action is based on, relates to, or is in response to the party's exercise of (1) the right of free speech . . . ." *Id.* § 27.005(b)(1). If the movant makes this showing, the burden shifts to the nonmovant to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). However, even if the nonmovant makes this showing, the trial court must dismiss the cause of action if the movant "establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id.* § 27.005(d). When determining whether to dismiss the legal action, the court must consider "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a).

In *In re Lipsky*, 460 S.W.3d 579 (Tex. 2015) (orig. proceeding), the supreme court discussed the meaning of the requirement that the nonmovant "establish[] by clear and specific evidence a prima facie case for each essential element." "Clear" means "unambiguous, sure, or free from doubt," and "specific" means "explicit or relating to a particular named thing." *Id.* at 590. A "prima facie case" is "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004)). It refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted. *Id.* "Clear and specific evidence" refers to the quality of evidence required to establish a prima facie case, and the term "prima facie case" refers to the amount of evidence required to satisfy the nonmovant's minimal factual burden. *Serafine v. Blunt*, No. 03-12-00726-CV, 2015 WL 3941219, at *3 (Tex. App.—Austin June 26, 2015, no pet. h.). The "clear and specific evidence" requirement does not impose an elevated evidentiary standard, nor does it categorically reject circumstantial evidence. *Lipsky*, 460 S.W.3d at 591.

## STANDARD OF REVIEW

We review de novo the trial court's determinations that the parties met or failed to meet their burdens of proof under section 27.005.[3]  *See Shipp v. Malouf*, 439 S.W.3d 432, 437 (Tex. App.—Dallas 2014, pet. denied).

The parties do not dispute that appellee's libel action "is based on, relates to, or is in response to" appellants' exercise of the right of free speech.  Therefore, appellee had the burden to establish her prima facie case by clear and specific evidence.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b), (c).

Libel is defamation expressed in written or other graphic form.  TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (West 2011).  A libel plaintiff must prove (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases.  *Lipsky*, 460 S.W.3d at 593.  A statement is defamatory if it tends to injure the subject's reputation, to expose her to public hatred, contempt, ridicule, or financial injury, or to impeach her integrity, honesty, or virtue.  *Id.* A statement may be false, unpleasant, abusive, or objectionable without being defamatory in light of the surrounding circumstances.  *Id*.  Whether a statement is capable of a defamatory meaning is initially a question of law for the court.  *Id*.  Moreover, to be actionable, a statement must assert an objectively verifiable fact rather than an opinion.  *Id*.  Merely expressing a defamatory statement in the form of an "opinion" does not shield it from tort liability because opinions often imply facts.  *Id.* We classify a statement as fact or opinion based on the

---

[3] In *Lipsky*, the supreme court concluded that the trial court "did not abuse its discretion in denying" the motion to dismiss under chapter 27. *Lipsky*, 460 S.W.3d at 596.  In that case, the supreme court was reviewing a petition for writ of mandamus, and mandamus issues to correct an abuse of discretion.  *See In re Connor*, 458 S.W.3d 532, 534 (Tex. 2015) (per curiam).  It does not appear the supreme court has addressed whether review on appeal from the denial of a motion to dismiss under chapter 27 should be de novo or for an abuse of discretion.  Therefore, we follow our precedent and review the trial court's determinations de novo.

statement's verifiability and the entire context in which the statement was made. *Id.* Whether a statement is a statement of fact or opinion is a question of law. *Id.*

## PRIMA FACIE CASE

In their first issue, appellants contend the trial court erred by determining appellee established a prima facie case of her libel claim by clear and specific evidence. Appellants argue the "clear and specific evidence" standard requires more than "some" evidence. They also argue this standard is a heightened standard, requiring "evidence that is unaided by presumptions, inferences, or intendments." *See Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). The supreme court disapproved of these concepts in *Lipsky*.[4] *See Lipsky*, 460 S.W.3d at 587–88, 591. The supreme court rejected the notion that the legislature imposed an elevated evidentiary standard or prohibited circumstantial evidence. *Id.* at 591. "[A] plaintiff must provide enough detail to show the factual basis for its claim. In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." *Id.* In determining whether the plaintiff presented a prima facie case, we consider only the pleadings and evidence in favor of the plaintiff's case. We do not consider whether the defendant presented evidence rebutting the plaintiff's case; such evidence is appropriate in determining a defendant's motion for summary judgment or at trial but not in determining whether the plaintiff presented a prima facie case.[5] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c) (issue is whether claimant established prima facie case for each essential element).

---

[4] The supreme court also disapproved of similar statements in this Court's cases of *Shipp v. Malouf*, 439 S.W.3d 432, 439 (Tex. App.—Dallas 2014, pet. denied), and *Young v. Krantz*, 434 S.W.3d 335, 342–43 (Tex. App.—Dallas 2014, no pet.). *See Lipsky*, 460 S.W.3d at 587, 591.

[5] The dissent paraphrases this statement of the standard of review for determining the existence of a prima facie case as considering "only the plaintiff's evidence" and states this interpretation of section 27.006(a) would render meaningless the statute's requirement that the court consider opposing affidavits in determining a motion to dismiss under the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a). We

–9–

In this case, "when, where, and what was said" was the magazine article itself, both in its printed form mailed to subscribers and sold in newsstands around Dallas in 2013 and, in its electronic form, still present on the internet through at least the date of the hearing in the trial court. Appellants assert the article was not defamatory, however, because the overall "gist" of the article was substantially true.

In determining whether a publication is defamatory, we construe the article as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). "[A] publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Id.* "[A] plaintiff claiming defamation based on a publication as a whole must prove that the publication's 'gist' is false and defamatory and the publication is not otherwise privileged." *Id.* at 115. A private individual may recover damages from a publisher for defamation upon a showing that: (1) the media defendant knew or should have known the publication was false; and (2) the content of the publication would warn a reasonably prudent editor of its defamatory potential. *Scripps Tex. Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829, 837 (Tex. App.—Corpus Christi 2003, pet. denied). "Negligent conduct is determined by asking 'whether the defendant acted reasonably in checking the truth or falsity or defamatory character of the communication before publishing it.'" *Id.* (quoting Restatement (Second) of Torts § 580B cmt. g (Am. Law Inst. 1977)). Thus, to determine whether appellee established a prima facie case, we must determine the gist of the article, whether the gist is false, whether the gist is

disagree. First, in considering whether the plaintiff established a prima facie case, we consider the evidence that supports the plaintiff's case, regardless of whether it was in a supporting or opposing pleading or affidavit. Second, before the court reaches the question of whether the plaintiff has established a prima facie case, the court must first determine whether the defendant has shown "by a preponderance of the evidence" that the plaintiff's cause of action concerns the defendant's exercise of the right of free speech, the right to petition, or the right of association. *Id.* § 27.005(b). And, if the court determines the plaintiff established a prima facie case, the court considers whether the defendant established a valid defense "by a preponderance of the evidence." *Id.* § 27.005(d). Determination of whether the defendant met the preponderance-of-the-evidence burden of proof requires consideration of all the evidence, regardless of its source.

–10–

defamatory, whether "the publication is not otherwise privileged,"[6] whether appellee was damaged unless the defamation was per se, and whether appellants were negligent in publishing the article. *See id.*; *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *see also Lipsky*, 460 S.W.3d at 593.

## The Gist of the Article

The parties disagree over what constitutes the gist of the article. Appellee asserts the gist of the article was that appellee had committed welfare fraud. Appellants argue the gist of the article "was that Rosenthal, who had a criminal history of theft, was obtaining and using SNAP benefits while living in a $1.15 million home in the wealthy HPISD."[7]

The "gist" of the article is its "main point or material part," its "essence." *Gist*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 959 (1981); *see also Gist*, BLACK'S LAW DICTIONARY 805 (10th ed. 2014). We determine the meaning of a publication from the perception of a reasonable person. *See Lipsky*, 460 S.W.3d at 594. We conclude that the gist is actually a combination of appellants' and appellee's statements of the gist. A reasonable person would conclude the article was a criticism of SNAP, which allowed appellee, who had been convicted of theft, to receive benefits while living in a $1.15 million home and while defrauding HHSC by filing false information with HHSC.

Appellants' assertion of the article's gist is a list of some of the facts set forth in the article, but it does not take into consideration its headline, "The Park Cities Welfare Queen," or

---

[6] Whether the lack of privilege is an element of the plaintiff's case, or whether the existence of a privilege is an affirmative defense, is not clear. In *Turner*, the supreme court appears to indicate that the lack of a privilege is part of the plaintiff's burden of proof. *Turner*, 38 S.W.3d at 114. In *Neely v. Wilson*, 418 S.W.3d 52 (Tex. 2013), the supreme court indicated it was a defense. *Id.* at 56. Traditionally, fair comment or opinion has been considered a qualified privilege and an affirmative defense. *See A.H. Belo & Co. v. Looney*, 246 S.W. 777, 781–83 (Tex. 1922). For purposes of this opinion, we view it both ways. Therefore, we first consider whether appellee established a prima facie case of the element of lack of privilege by clear and specific evidence, and then we consider whether appellants established a privilege as an affirmative defense by a preponderance of the evidence.

[7] Appellants' statement on appeal of the gist of the article is more expansive than that set forth in their motion to dismiss in the trial court: "The gist of the Defendants' Article was that Plaintiff was receiving SNAP benefits while living in one of the most expensive neighborhoods in Dallas."

the categorization of the article, "[Crime]." The term "Welfare Queen" has two meanings; it can mean either (1) a woman who has defrauded the welfare system by using false information to obtain benefits to which she is not legally entitled, and it can also mean (2) a woman who has exploited the welfare system by having children out of wedlock and avoiding marital relationships for the purpose of continuing to qualify legally for government benefits.[8] In this case, the pleadings and evidence indicate it can mean only the former, that appellee was committing welfare fraud. Appellee had only one child, she presented evidence she had been married and had gone through a protracted divorce and lengthy child-custody proceedings that exhausted her savings and income, and as the article states, she was engaged to be married to an apparently wealthy man at the time of the publication of the article. Thus, appellee does not fit the definition of "welfare queen" as a person who remains legally qualified for benefits by having children out of wedlock and avoiding marital relationships. Therefore, the title, "Park Cities Welfare Queen," means a woman in the Park Cities who is committing fraud to receive government-assistance benefits illegally. Placing the word "[Crime]" over the headline "The Park Cities Welfare Queen" on the cover and the article would indicate to a reasonable person that the article concerned a person, a welfare queen, who was committing a crime, namely,

---

[8] The term "welfare queen" with its first meaning was coined in 1974 in articles in the *Chicago Tribune* newspaper and *Jet* magazine referring to a notorious case of welfare fraud. *Welfare Queen*, WIKIPEDIA, https://en.wikipedia.org/wiki/Welfare_queen (last visited Aug. 28, 2015) ("WIKIPEDIA"). The articles were about Linda Taylor, who, according to the *Tribune*, used three Social Security cards, 27 names, 31 addresses, and 25 telephone numbers to obtain $150,000 in illicit welfare cash. *See* WIKIPEDIA; *see also* Josh Levin, *The Welfare Queen*, SLATE (Dec. 19, 2013), http://www.slate.com/articles/news_and_politics/history/2013/12/linda_taylor_welfare_queen_ronald_reagan_made_her_a_notorious_american_villain.html ("SLATE"). Taylor used the money to finance a lifestyle of new cars, expensive clothes, fur coats, and jewelry. SLATE. Taylor was eventually convicted of stealing $8,000 of welfare funds using four aliases. *Id.* Ronald Reagan referred to Taylor's welfare fraud during his 1976 Presidential campaign, and he used the phrase "welfare queen" in a radio commentary. WIKIPEDIA; SLATE. The term was later applied to other notorious cases of welfare fraud. *See People v. Williams*, 164 Cal. Rptr. 767, 771 (Cal. Ct. App. 1980) (Barbara Williams, who received more than $200,000 of government benefits to which she was not entitled by using aliases and false birth certificates claiming more than 70 children, was "the Welfare Queen"); Lois Timnick, *'Welfare Queen' Arrested on New Fraud Charges*, LOS ANGELES TIMES, (May 22, 1987), http://articles.latimes.com/1987-05-22/news/mn-1219_1_welfare-fraud ("'Welfare Queen' Dorothy Woods" convicted of stealing $377,000 in welfare payments "by posing as a dozen impoverished women with a total of 49 dependent children, while she was actually living in splendor in Pasadena—in a mansion with a live-in housekeeper, several luxury cars, mink coats and a swimming pool"). Subsequently, the phrase became part of the political discourse of welfare reform and evolved its second meaning involving the most odious of racial and gender stereotypes and prejudices to mean a woman, usually a minority, exploiting the public-assistance system by having multiple children and avoiding marital relationships to continue her eligibility for benefits. *See* Risa E. Kaufman, *The Cultural Meaning of the "Welfare Queen": Using State Constitutions to Challenge Child Exclusion Provisions*, 23 N.Y.U. REV. L. & SOC. CHANGE 301, 310 (1997).

welfare fraud.[9]  The statement in the article that appellee "must have been less than forthcoming when she renewed her application online in October 2012" would indicate to a reasonable person that appellee submitted false information to HHSC in her application for renewal of benefits.

A reasonable person would conclude from the article that appellee committed fraud by submitting false information to HHSC to continue to receive SNAP benefits to which she otherwise would not have been entitled.  We agree with appellee that the gist of the article included the assertion that appellee had committed welfare fraud.

### Truth or Falsity of the Gist

Appellee testified in her affidavit that after the article was published, HHSC, which is responsible for SNAP, investigated whether appellee had committed fraud.  *See* TEX. HUM. RES. CODE ANN. § 33.0006 (West 2013) (HHSC "operates the supplemental nutrition assistance program").  Appellee's evidence in her response to the motion to dismiss included a letter from a Deputy Inspector General of HHSC stating the Commission had investigated the facts asserted in the article and related information and "found no evidence anyone has fraudulently obtained or otherwise abused state benefits."

The article implied that appellee committed fraud by falsely stating her address on SNAP benefits renewal forms, failing to report income or other support from properties in her daughter's living trust (or that she was hiding the properties by placing them in the trust), and failing to report financial subsidies from her fiancé.

Appellee stated in her affidavit that when she filled out the application for SNAP benefits, she answered all questions truthfully.  She testified that she had always used her parents' address on La Cabeza Drive as her mailing address.  She stated she put that address on

---

[9] Appellants argue that the heading "[Crime]" was not to indicate appellee had committed the crime of welfare fraud but because the article was about the propriety of the law allowing persons with a history of theft charges to qualify for welfare benefits.  This may be the gist of the fifth column by itself, but it is not the gist of the article as a whole.  Furthermore, the heading "[Crime]" for an article about persons with criminal backgrounds lawfully receiving SNAP benefits would not make sense because the article would not be about crime.

–13–

the SNAP benefits application form and on the affidavit of indigency form because those forms asked for her mailing address. Appellee stated in her petition that she was not financially supported by her fiancé.

Appellee stated her brother set up the living trust for her daughter, and the properties in the living trust were vacant land, not "households" as the article stated. She testified that none of the properties were worth more than $9,000 and that she and her daughter had never received any income or value from the trust. Appellee's brother stated in an affidavit that he purchased the properties at "distressed prices" and put them into a trust at the suggestion of his "trust and estate lawyer." He also testified he did not tell appellee or her daughter about the trust before the article was published. Appellee attached to her affidavit information from the website of Dallas Central Appraisal District showing the District's valuation of the properties. This information supported appellee's statements that the properties had no improvements and were all valued less than $9,000. Because appellee presented evidence she did not own the properties, and she and her daughter had no knowledge of the living trust and received no income or other benefit from it, appellee presented evidence that the import from the article's discussion of the trust—that appellee filed false information with HHSC by failing to report the trust to HHSC—was false.

After considering appellee's pleadings and affidavits, we conclude appellee presented sufficient clear and specific evidence to establish a prima facie case that part of the article's gist, that she had committed welfare fraud, was not true.

**Defamatory Nature of the Gist of the Article**

Next, we consider whether the article's assertion that appellee committed welfare fraud was defamatory. An article is defamatory if it

> tends to blacken the memory of the dead or . . . tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation

–14–

or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.

TEX. CIV. PRAC. & REM. CODE ANN. § 73.001. Falsely accusing a person of a crime is considered defamation per se. *See Lipsky*, 460 S.W.3d at 596.

Part of the article's gist was that appellee had lied to HHSC to receive SNAP benefits of "a cool $10,276" to which she was not entitled under the law. Appellee presented a prima facie case that this allegation was false. Unlawful receipt of SNAP benefits in this amount is a felony. *See* 7 U.S.C. § 2024(b), (c); TEX. HUM. RES. CODE ANN. § 33.011(a), (b) (West 2013); TEX. PENAL CODE ANN. § 31.03(e)(4) (West Supp. 2014).

We conclude appellee presented a prima facie case by clear and specific evidence that the article's gist was defamatory because it falsely accused her of committing a crime.

### Whether the Publication Was Privileged

Section 73.002 of the Texas Civil Practice and Remedies Code provides that certain communications are privileged for periodical publishers.

(a) The publication by a newspaper or other periodical of a matter covered by this section is privileged and is not a ground for a libel action. . . .

(b) This section applies to:

. . . .

(2) reasonable and fair comment on or criticism of an official act of a public official or other matter of public concern published for general information.

TEX. CIV. PRAC. & REM. CODE ANN. § 73.002 (West 2011). This privilege extends to "reasonable and fair comment on or criticism" of a matter of public concern. However, false statements of fact concerning a person that are defamatory are not protected by the privilege. *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 949 (5th Cir. 1983); *Davila v. Caller Times Pub. Co.*, 311 S.W.2d 945, 947 (Tex. Civ. App.—San Antonio 1958, no writ). To the extent that the article is comment or criticism of SNAP, it is privileged. However,

–15–

to the extent it states falsely that appellee committed fraud on HHSC by making false statements in applying for SNAP benefits, it is not privileged.

We conclude appellee presented a prima facie case by clear and specific evidence that the article's defamatory statements that she had committed welfare fraud were not privileged.

**Fault**

Appellee also had to make a prima facie case that appellants acted with the requisite degree of fault.[10] "A private individual need only prove negligence." *Lipsky*, 460 S.W.3d at 593. "Negligent conduct is determined by asking 'whether the defendant acted reasonably in checking the truth or falsity or defamatory character of the communication before publishing it.'" *Scripps Tex. Newspapers, L.P.*, 99 S.W.3d at 837 (quoting RESTATEMENT (SECOND) OF TORTS § 580B cmt. g). The following factors may be considered in determining the thoroughness of the check that a reasonable person would make before publishing a statement: (1) the time element; (2) the nature of the interests the defendant was seeking to promote by publishing the communication; and (3) the extent of the damage to the plaintiff's reputation, or the injury to his sensibilities that would be produced if the communication proved to be false. *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 580B cmt. h).

In this case, nothing indicates the newsworthiness of the article was time sensitive. The subject of the article, fraud by an applicant for government benefits, did not compel hurried publication. The damage to appellee's reputation in this case was great, as shown by her

---

[10] *Lipsky* appears to be internally inconsistent on whether negligence is an element the plaintiff must establish to avoid dismissal under the TCPA. At one point, the supreme court states, "In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." *Lipsky*, 460 S.W.3d at 591. The element of negligence or other fault is noticeably absent from this statement. Later in the opinion, while listing the elements of a defamation cause of action, the supreme court lists "the requisite degree of fault" and states, "A private individual need only prove negligence . . . ." *Id.* at 593. Although the opinion states that fault is an element of a defamation claim, the court did not discuss that element in its analysis determining the trial court did not abuse its discretion by denying the defendant's motion to dismiss. *See id.* at 593–96. However, it does not appear that the movant for dismissal in that case asserted the plaintiff failed to establish a prima facie case of negligence. *See id.*; *see also In re Lipsky*, 411 S.W.3d 530 (Tex. App.—Fort Worth 2013, orig. proceeding), *mand. denied*, 460 S.W.3d 579 (Tex. 2015). Therefore, whether the claimant established the element of fault may not have been before the supreme court. This Court has determined that fault, either negligence or actual malice, is an essential element that the plaintiff must establish by clear and specific evidence to overcome a motion to dismiss under the TCPA. *See Young v. Krantz*, 434 S.W.3d 335, 343–44 (Tex. App.—Dallas 2014, no pet.).

–16–

pleading and testimony. Therefore, appellants should have had the opportunity to conduct a thorough check of the veracity of the article.

The editor of D Magazine and the Community Engagement Manager of D Magazine Partners, L.P. testified in their affidavits that they checked the veracity of the article by discussing with the author her interview of two HHSC officers "and confirming that the substance of the interviews was accurately stated." The editor and community engagement manager also testified they examined:

a change-of-address letter filed by appellee in a lawsuit showing her address had changed from Irving to Bryn Mawr Drive in Dallas;

an affidavit of indigency filed by appellee in August 2012 in a lawsuit stating that her address was on La Cabeza Drive;

the Dallas Central Appraisal District's website, which showed appellee's fiancé's house was appraised at $1.15 million;

Dallas County property records listing multiple properties belonging to appellee's daughter's living trust;[11]

Collin County and Texas Department of Public Safety criminal records regarding appellee; and

a blank SNAP benefits application form.

Appellee testified in her affidavit that someone claiming to be the editor of D Magazine called her and said the magazine was publishing an article about her committing welfare fraud. Appellee said the editor did not ask her about any of the specific statements that appeared in the article.[12]

---

[11] Attached to the editor's affidavit was a document from the website of Dallas Central Appraisal District showing there were eight properties in the living trust, not nine as the article stated.

[12] The editor also testified that he contacted appellee to ask for her side of the story. He stated that appellee said she did not believe he was the editor of D Magazine and explained she had a stalker. The editor said he told appellee to "Google" D Magazine's front desk number and call him back, but she never returned his call. We do not consider this evidence because it rebuts appellee's version of events. Because the issue is whether appellee established a prima facie case, we do not consider evidence rebutting the evidence in support of her case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

Appellee pleaded and testified in her affidavit that her fiancé's ex-girlfriend, who had been harassing her, placed two telephone calls to HHSC and pretended to be appellee, using appellee's name, address, and social security number.[13] Transcripts of HHSC's recordings of the telephone calls show the caller obtained much of the information about appellee's SNAP benefits account that appeared in the article that was attributed to HHSC's employees, including the amount of benefits appellee received and the stores and times that she spent SNAP funds.[14] At the end of the second telephone call, the caller told HHSC that the caller was an investigative reporter. The editor and community engagement manager stated in their affidavits that they verified the truth of the factual statements in the article in part through their "discussions with the freelance author regarding her interview of two HHSC officers cited in the article and confirming that the substance of the interviews was accurately stated." This statement, combined with appellee's testimony about the telephone calls to HHSC from her harasser pretending to be appellee, indicates the freelance author may have been appellee's harasser.[15]

This evidence indicates appellants did not act reasonably in checking the truth or falsity of the defamatory character of the communication before publishing the article. The evidence in support of appellee's libel claim shows the editor did not tell appellee the specific statements in the article when seeking her side of the story. His affidavit indicates he and the community engagement manager did nothing to check the credibility of the anonymous author who may

---

[13] Appellee stated in her affidavit that she obtained from HHSC recordings of telephone calls to HHSC concerning her benefits. Appellee testified that, other than the calls she made, she recognized the voice of the caller on the recordings as that of her harasser.

[14] The transcripts of the telephone calls do not contain information about the date of appellee's renewal-of-benefits application or that the application "lists $135 in a checking account . . . and $35 in expenses for the Suzuki." The article states this information was obtained from "the HHSC eligibility department officer." The record does not disclose the circumstances under which this information was obtained from the eligibility department officer. All of the information in the article about appellee's SNAP benefits account was confidential, and it is a criminal offense to solicit such information from an HHSC employee other than "for purposes directly connected with the administration of the department's assistance programs." TEX. HUM. RES. CODE ANN. § 12.003 (West 2013).

[15] The editor testified that the freelance author's name was not the same as the woman appellee identified as her harasser. We do not consider this evidence at this stage of the litigation because the question is whether appellee established a prima facie case of the element of negligence by clear and specific evidence, not whether appellants presented evidence tending to rebut the prima facie case. See TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

have been appellee's harasser. The evidence also indicates they did not confirm the truth of the interviews of the anonymous author with the HHSC employees by contacting them. A reasonable deduction from the evidence is that if the editor and community engagement manager had taken these steps, they would have learned that the article's assertion that appellee "must have been less than forthcoming," i.e., that she committed welfare fraud, was false.

We conclude the pleadings and affidavits established a prima facie case of the element of negligence by clear and specific evidence.

### Damages

Appellee pleaded that appellants committed libel per se by falsely stating she committed a crime. *See Lipsky*, 460 S.W.3d at 596 (accusing someone of a crime is defamation per se). "When an offending publication qualifies as defamation per se, a plaintiff may recover general damages without proof of any specific loss." *Id.* As discussed above, a reasonable person could read the article and conclude the article accused appellee of committing welfare fraud, which is a crime under federal and state law. Because the defamation was defamation per se, "actual damage is not an essential element of the claim to which the TCPA's burden of clear and specific evidence might apply." *Id.*

We conclude appellee presented a prima facie case by clear and specific evidence of each element of her cause of action for libel. We overrule appellants' first issue.

### AFFIRMATIVE DEFENSES

In their second issue, appellants contend the trial court erred by denying their motion to dismiss because appellants "established the essential elements of one or more affirmative defenses by a preponderance of the evidence." In making this determination, the court considers all the evidence, that is, the pleadings and supporting and opposing affidavits. *See* TEX. CIV.

PRAC. & REM. CODE ANN. §§ 27.005(d), .006(a). Appellants assert they proved two affirmative defenses: truth, and the fair comment qualified privilege.

**Truth**

Section 73.005 of the Texas Civil Practice and Remedies Code codifies the traditional rule that "[t]he truth of the statement in the publication on which an action for libel is based is a defense to the action." TEX. CIV. PRAC. & REM. CODE ANN. § 73.005 (West 2011). Appellants assert the pleadings and evidence establish the substantial truth of the factual statements in the article. Appellee was staying in a $1.15 million house while receiving SNAP benefits. The house was only a half block outside the city limits of University Park and was in the Highland Park school district. Even if appellee was not convicted of theft, she pleaded guilty and nolo contendere to theft charges and was placed on community supervision for theft. Eight properties were in appellee's daughter's living trust. And appellee used her parents' address for her mailing address on the application for renewal of benefits and on an affidavit of indigency filed in a civil court case and not the address near University Park where she was actually living at the time.

However, the record contains no evidence to support the truth of the allegation that appellee made false statements on the application for renewal of the benefits. Appellants did not allege in their pleading or set forth in their affidavits what appellee actually stated in the application. Appellants provided the trial court a blank copy of an application for SNAP benefits. The substance of the form indicates it is the form for an initial application of benefits. But the application does not state it is the form used for renewal of benefits, and appellants presented no other evidence that the same form was used for renewal of benefits at the time appellee applied for renewal of benefits. Because appellants presented no evidence that they had knowledge of what appellee was required to tell HHSC when applying for a renewal of SNAP

–20–

benefits, they also presented no evidence that the article spoke truthfully about the information appellee failed to disclose to HHSC when renewing her application for benefits.[16]

We conclude appellants failed to establish by a preponderance of the evidence that the implications in the article that appellee presented false information by failing to disclose required information to HHSC was true.

### Fair Comment Privilege

Appellants also assert they established by a preponderance of the evidence that appellee's libel claim is barred by the statutory fair comment privilege. Section 73.002 of the Texas Civil Practice and Remedies Code provides that a publication in a periodical is privileged and not a ground for a libel action if it is a "reasonable and fair comment on or criticism of . . . [a] matter of public concern published for general information." TEX. CIV. PRAC. & REM. CODE ANN. § 73.002(a), (b)(2) (West 2011). The privilege is an affirmative defense to an action for defamation. *Lucas v. Burleson Publ'g Co.*, No. 10-01-00228-CV, 2004 WL 1177199, at *1 (Tex. App.—Waco May 26, 2004, no pet.) (mem. op.); *see Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990)). However, a false statement of fact concerning a person that is defamatory, even if made in a discussion of matters of public concern, is not privileged as fair comment. *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 949 (5th Cir. 1983); *Davila v. Caller Times Pub. Co.*, 311 S.W.2d 945, 947 (Tex. Civ. App.—San Antonio 1958, no writ).

Appellants argue they established the fair comment privilege because the article was comment or criticism about SNAP's allowing a woman who lived in a $1.15 million home to obtain taxpayer-funded assistance designed to aid the poor. If that was the extent of the article,

---

[16] The article states, "[Appellee's] October SNAP renewal lists $135 in a checking account, according to the HHSC eligibility officer, and $35 in expenses for the Suzuki [appellee's automobile]." The record contains no evidence of the truth of this statement. The record also contains no evidence that appellee was financially subsidized by her fiancé or that she had any knowledge of, interest in, or received any benefit from the properties in her daughter's living trust.

then the article might be privileged as fair comment or criticism. However, the article went on to identify the woman as appellee and assert she had been "less than forthcoming" with HHSC about her status, which is an assertion that appellee lied on the application form for renewal of benefits, which is a crime. We conclude appellants failed to establish the qualified privilege of fair comment by a preponderance of the evidence.

We overrule appellants' second issue.

## ATTORNEY'S FEES

In their third issue, appellants contend we should remand the cause to the trial court for determination and award of their attorney's fees and costs. Section 27.009 of the TCPA provides, "If the court orders dismissal of a legal action under this chapter, the court shall award to the moving party: (1) court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a)(1) (West 2015). "'Legal action' means a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." *Id.* § 27.001(6).

Appellants' motion to dismiss prayed for an award of "reasonable attorneys' fees, costs and expenses." The trial court's order on the motion to dismiss granted the motion on appellee's claims under the DTPA, the ITEPA, and appellee's claims brought on her daughter's behalf and ordered that appellee take nothing on those claims. The order also stated that the motion was denied "in all other respects as the Court finds that Plaintiff has established by clear and specific evidence a *prima facie* case of defamation."

Appellants assert the trial court erred by denying their request for reasonable and necessary attorney's fees and costs on appellee's libel claim on her own behalf because the trial court erred by denying the motion to dismiss on that claim. Appellants were not entitled to

–22–

attorney's fees and costs on that claim unless they prevailed on their motion to dismiss that claim. *See id.* § 27.009(a)(1). Appellants have not shown the trial court erred by denying the motion to dismiss that claim. Because appellants have not prevailed on their motion to dismiss the libel claim, the trial court did not err by denying the request for attorney's fees and costs as to that claim. *See Reyna v. Baldridge*, No. 04-14-00740-CV, 2015 WL 4273265, at *7 (Tex. App.—San Antonio July 15, 2015, no pet. h.) (mem. op.).

Appellants assert the trial court erred by not awarding them their fees on the legal actions the trial court dismissed, the DTPA and IETPA legal actions and the legal actions appellee brought on her daughter's behalf. Under section 51.014(a)(12), we have jurisdiction to review the trial court's *denial* of a motion to dismiss filed under the TCPA. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(12) (West 2015). Appellants' claim for attorney's fees on these legal actions relates to the trial court's *grant* of the motion to dismiss. Our jurisdiction under section 51.014 does not extend to the claim for attorney's fees on these legal actions. *See Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 355 (Tex. 2001) (legislature intended section 51.014 be strictly construed as narrow exception to general rule that only final judgments are appealable).

We overrule appellants' third issue.

### CONCLUSION

We affirm the trial court's order.


/Lana Myers/
LANA MYERS
JUSTICE

Brown, J., dissenting

–23–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

D Magazine Partners, L.P. d/b/a D
Magazine, Magazine Limited Partners, L.P.
and Allison Media, Inc., Appellants

No. 05-14-00951-CV          V.

Janay Bender Rosenthal, Appellee

On Appeal from the 134th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-01346-G.
Opinion delivered by Justice Myers, Justices
Francis and Brown participating.

In accordance with this Court's opinion of this date, the order of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee Janay Bender Rosenthal recover her costs of this appeal
from appellants D Magazine Partners, L.P. d/b/a D Magazine, Magazine Limited Partners, L.P.
and Allison Media, Inc.


Judgment entered this 28th day of August, 2015.