**AFFIRM in Part, and REVERSE and REMAND, Opinion Filed December 30, 2015.**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-14-01017-CV

**JOHN TATUM AND MARY ANN TATUM, Appellants**
**V.**
**THE DALLAS MORNING NEWS, INC. AND STEVE BLOW, Appellees**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-07371**

## OPINION

Before Justices Lang, Fillmore, and Whitehill
Opinion by Justice Whitehill

Appellants John and Mary Ann Tatum sued appellees Steve Blow and The Dallas Morning News (DMN) for libel regarding a column that Blow wrote and DMN published one month after the Tatums' son Paul committed suicide. The column, captioned "Shrouding suicide leaves its danger unaddressed," criticized people who are dishonest about loved ones' suicides. Although the column did not mention the Tatums by name, it quoted from Paul's obituary and it described him and events surrounding his death. People who were familiar with the situation understood the column to refer to Paul and his parents. In addition to their libel claims, the Tatums also asserted DTPA claims against DMN.

Appellees won a take-nothing summary judgment.

In two appellate issues, the Tatums urge that the trial court erred in granting the summary judgment dismissing their libel and DTPA claims.

We conclude that summary judgment was proper as to the Tatums' DTPA claims but not as to their libel claims. Accordingly we affirm in part, reverse in part, and remand the case to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

**A.     Factual Allegations.**

We draw this factual recitation from the allegations in the Tatums' live petition:

The Tatums were Paul Tatum's parents. In May 2010, Paul was a seventeen-year-old high school student. He was an excellent and popular student, an outstanding athlete, and had no history of mental illness.

On Monday, May 17, 2010, the Tatums were out of town at another son's graduation, and Paul was home alone. That night, Paul was involved in a one-car automobile accident. After the accident, he began sending incoherent text messages to friends.

He made his way home from the accident scene and began drinking champagne. He then called a friend, and their conversation prompted her and her mother to drive to the Tatums' house during the early morning hours of May 18. Paul's friend went in the house and found Paul "dazed, confused, irrational, incoherent, and apparently in physical anguish and holding one of the family's firearms." Paul's friend left him alone to tell her mother the situation, and as she left she heard a gunshot. Paul died from a gunshot wound to the head.

The Tatums wrote an obituary for Paul and paid DMN to publish the obituary in the *Dallas Morning News* newspaper. Believing that Paul's suicide was caused by a brain injury he sustained in the earlier automobile accident, the Tatums stated in the obituary that Paul died "as a

–2–

result of injuries sustained in an automobile accident." The obituary was published on May 21, 2010.

One month later, on Father's Day, June 20, 2010, DMN published a column written by Blow. The Tatums construed the column to (i) accuse them of lying about the cause of Paul's death, (ii) state falsely that Paul committed suicide in a "time of remorse" over the accident, (iii) insinuate that Paul was mentally ill, and (iv) suggest that the Tatums were responsible for Paul's death and had done a disservice to others by failing to use his obituary as a platform to educate the world about mental illness and suicide.

Additionally, the summary judgment evidence established that the Tatums were out of town the day the column was published. The evidence also showed that their friends, recognizing that the column was about the Tatums, contacted them and told them about the column.

This lawsuit followed.

**B.      The Column.**

The summary judgment evidence included a copy of the printed version of the newspaper column that prompted this suit. The column's headline was "*Shrouding* suicide leaves its danger unaddressed." (Emphasis added). There was a page break in the middle of the column, and a slightly different headline appeared over the remainder of the column when it resumed on another page: "Shrouding suicide in secrecy leaves its danger unaddressed." The column, with emphasis added, stated as follows:

> So I guess we're down to just one form of death still considered *worthy of deception*.
>
> I'm told there was a time when the word "cancer" was never mentioned. Oddly, it was considered an embarrassing way to die.
>
> It took a while *for honesty* to come to the AIDS epidemic. Ironically, the first person I knew to die of AIDS was said to have cancer.

*We're open* these days with just about every form of death *except one—* suicide.

When art expert Ted Pillsbury died in March, his company said he suffered an apparent heart attack on a country road in Kaufman County.

But what was apparent to every witness on the scene that day was that Pillsbury had walked a few paces from his car and shot himself.

Naturally, with such a well-known figure, *the truth* quickly came out.

More recently, a paid obituary in this newspaper reported that a popular local high school student died "as a result of injuries sustained in an automobile accident."

When one of my colleagues began to inquire, thinking the death deserved news coverage, *it turned out to have been* a suicide.

*There was a car crash, all right, but* death came from a self-inflicted gunshot wound [*page break*] in a time of remorse afterward.

And for us, there the matter ended. Newspapers don't write about suicides unless they involve a public figure or happen in a very public way.

But is that always best?

I'm troubled that we, as a society, allow suicide to remain cloaked in such secrecy, *if not outright deception*.

Some obituary readers tell me they feel guilty for having such curiosity about how people died. They're frustrated when obits don't say. "Morbid curiosity," they call it apologetically.

But I don't think we should feel embarrassment at all. I think the need to know is wired deeply in us. I think it's part of our survival mechanism.

Like a cat putting its nose to the wind, that curiosity is part of how we gauge the danger out there for ourselves and our loved ones.

And the secrecy surrounding suicide leaves us greatly underestimating the danger there.

Did you know that almost twice as many people die each year from suicide as from homicide?

Think of how much more attention we pay to the latter. We're nearly obsessed with crime. Yet we're nearly blind to the greater threat of self-inflicted violence.

Suicide is the third-leading cause of death among young people (ages 15 to 24) in this country.

Do you think that might be important for parents to understand?

In part, we don't talk about suicide because we don't talk about the illness that often underlies it—mental illness.

I'm a big admirer of Julie Hersh.[1]  The Dallas woman first went public with her story of depression and suicide attempts in my column three years ago.

She has since written a book, *Struck by Living*.  *Through honesty*, she's trying to erase some of the shame and stigma that compounds and prolongs mental illness.

Julie recently wrote a blog item titled "Don't omit from the obit," urging more openness about suicide as a cause of death.

"I understand why people don't include it," she told me.  "But it's such a missed opportunity to educate."

And she's so right.

Listen, the last thing I want to do is put guilt on the family of suicide victims.  They already face a grief more intense than most of us will ever know.

*But averting our eyes from the reality* of suicide only puts more lives at risk.

Awareness, *frank discussion*, timely intervention, treatment—those are the things that save lives.

*Honesty* is the first step.

## C.    Procedural History and Appellate Issues.

The Tatums sued both appellees for libel and libel *per se*.  They also sued DMN for DTPA violations.  DMN counterclaimed for its attorneys' fees under the DTPA.

Appellees filed a traditional and no-evidence summary judgment motion.  About three months later, they filed an amended traditional and no-evidence summary judgment motion.  The Tatums timely responded.

---

[1] The Tatums sued Julie Hersh in a separate lawsuit.  That lawsuit was dismissed, and the Tatums appealed.  That appeal is also being decided today, *John Tatum and Mary Ann Tatum v. Julie Hersh*, No. 05-14-01318-CV.

The trial court granted appellees' amended summary judgment motion, and the Tatums timely filed a notice of appeal. The court then vacated its judgment and stayed the case pending the resolution of a defamation case then pending in the Texas Supreme Court. The trial court later lifted the stay and again rendered a take-nothing summary judgment against the Tatums. The court also dismissed DMN's counterclaim with prejudice. The court did not state the basis for any of its rulings. The Tatums timely filed a second notice of appeal.

The Tatums assert two appellate issues: (1) The trial court erred by granting summary judgment on their libel claims; and (2) the trial court erred by granting summary judgment on their DTPA claims. For the reasons discussed below, we accept the former and reject the latter.

## II. STANDARD OF REVIEW

We review a summary judgment de novo. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013). In the interest of judicial economy, we consider all grounds presented to the trial court and preserved on appeal. *Id*. at 60.

When reviewing a traditional summary judgment for a defendant, we determine whether the defendant conclusively disproved an element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). We must take evidence favorable to the nonmovant as true, and we must indulge every reasonable inference and resolve every doubt in the nonmovant's favor. *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 800 (Tex. 1994) "A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence." *In re Estate of Hendler*, 316 S.W.3d 703, 707 (Tex. App.—Dallas 2010, no pet.).

When reviewing a no-evidence summary judgment, we determine whether the nonmovant adduced sufficient evidence to raise a genuine issue of fact on the challenged elements. *Smith v. Deneve*, 285 S.W.3d 904, 909 (Tex. App.—Dallas 2009, no pet.). We review

the evidence in the light most favorable to the nonmovant, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). A no-evidence summary judgment should be reversed if the evidence is sufficient for reasonable and fair-minded jurors to differ in their conclusions. *Anderton v. Cawley*, 378 S.W.3d 38, 46 (Tex. App.—Dallas 2012, no pet.).

### III. ANALYSIS

### A. Issue One: Did the trial court err by dismissing the Tatums' libel claims?

The Tatums' first appellate issue argues that the trial court erred by granting summary judgment on their libel claims. We agree with the Tatums.

#### 1. Applicable Law.

Defamation has two forms: slander and libel. *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.). Slander is an oral defamation. *Id.* This case involves libel, which is a defamation expressed in written or other graphic form. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (West 2011).

If, as concerns the present case, the plaintiff is a private individual rather than a public official or public figure, the elements of defamation are: (1) the defendant published a statement, (2) the statement was defamatory concerning the plaintiff, and (3) the defendant acted with negligence regarding the statement's truth.[2] *Neely*, 418 S.W.3d at 61; *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). The plaintiff must also prove damages unless the defamatory statements are defamatory *per se*. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (orig. proceeding).

---

[2] If the plaintiff is a public official or a public figure, the required culpability is elevated from negligence to actual malice; that is, the plaintiff must prove that the defendant published the defamatory statement with knowledge that it was false or with reckless disregard as to whether it was true or false. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Moreover, a public figure must prove actual malice by clear and convincing evidence. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 119 (Tex. 2000).

A statement is defamatory if it tends to (i) injure a person's reputation, (ii) expose him to public hatred, contempt, ridicule, or financial injury, or (iii) impeach his honesty, integrity, or virtue. *Am. Heritage Capital, LP v. Gonzalez*, 436 S.W.3d 865, 875 (Tex. App.—Dallas 2014, no pet.); *see also* CIV. PRAC. § 73.001.

Examples of defamation *per se* include (i) accusing someone of a crime, (ii) accusing someone of having a foul or loathsome disease, (iii) accusing someone of serious sexual misconduct, and (iv) disparaging another's fitness to conduct his or her business or trade. *In re Lipsky*, 460 S.W.3d at 596.

To be actionable defamation, a statement must be a statement of verifiable *fact* rather than opinion. *See Neely*, 418 S.W.3d at 62 ("[S]tatements that are not verifiable as false cannot form the basis of a defamation claim."); *see also Am. Heritage Capital*, 436 S.W.3d at 875; *Main v. Royall*, 348 S.W.3d 381, 389 (Tex. App.—Dallas 2011, no pet.). But a statement couched as an opinion may be actionable if it expressly or implicitly asserts facts that can be objectively verified. *Avila v. Larrea*, 394 S.W.3d 646, 658 (Tex. App.—Dallas 2012, pet. denied).

We construe an allegedly defamatory publication as a whole in light of the surrounding circumstances and based on how a person of ordinary intelligence would perceive it. *Turner*, 38 S.W.3d at 114. The hypothetical "person of ordinary intelligence" is one who exercises care and prudence, but not omniscience, when evaluating an allegedly defamatory communication. *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004).

Placing the burden of proving truth or falsity is a complex matter. The Supreme Court has held that a defamation plaintiff must prove falsity if (i) the plaintiff is a public figure, or (ii) the defendant is a media defendant and the statement involves a matter of public concern. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16, 19–20 & n.6 (1990); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775–76 (1986); *see also Turner*, 38 S.W.3d at 116; *Klentzman v. Brady*,

456 S.W.3d 239, 263–64 (Tex. App.—Houston [1st Dist.] 2014, pet. pending). In cases not covered by these mandates, Texas has generally made truth an affirmative defense to defamation. *See* CIV. PRAC. § 73.005(a) (truth is a defense to a libel action); *see also Neely*, 418 S.W.3d at 62 (mentioning "the defense of truth" and citing § 73.005); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) ("In suits brought by private individuals, truth is an affirmative defense to slander.") (footnote omitted).

But recent Texas defamation cases may suggest that the plaintiff always has the burden of proving falsity. In *Lipsky*, for example, the supreme court said, "Defamation's elements include (1) the publication of a *false* statement of fact to a third party . . . ." 460 S.W.3d at 593 (emphasis added). We recently cited *Lipsky* and placed the burden of proving falsity on the plaintiff in a libel case involving the Texas Citizens Participation Act, CIV. PRAC. §§ 27.001–.011. *See D Magazine Partners, L.P. v. Rosenthal*, No. 05-14-00951-CV, 2015 WL 5156908, at *5, *8 (Tex. App.—Dallas Aug. 28, 2015, pet. filed). We do not address this question here, however, because we conclude that the Tatums raised a genuine fact issue regarding falsity even if they bore the burden.

### 2. Summary Judgment Grounds.

Appellees asserted several summary judgment grounds. Their traditional grounds were:

- The column was not "of and concerning" the Tatums.

- The column was not capable of the defamatory meaning ascribed by the Tatums.

- The column was true or substantially true.

- The column was privileged as a fair, true, and impartial account of official proceedings.

- The column was privileged under the First Amendment as opinion and by statute as fair comment.

–9–

- Appellees negated actual malice, defeating the Tatums' libel claims entirely if they are limited-purpose public figures and defeating their exemplary damage claims if they are private figures.

Appellees' no-evidence grounds were:

- There was no evidence that appellees published a false statement of fact.

- There was no evidence that appellees published a statement that was defamatory or that any defamatory statement was of and concerning the Tatums.

- There was no evidence of actual malice.

- To the extent a negligence standard applies, there was no evidence of negligence.

### 3. Did the Tatums raise a genuine fact issue regarding whether the column was about them?

A defamation plaintiff must prove that the allegedly defamatory statement referred to him or her. *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960). In that regard, the statement must point to the plaintiff and to no one else. *Id.* at 894. "A statement does not have to refer to the plaintiff by name, however, if people who know and are acquainted with the plaintiff reasonably understand from reading the statement that it referred to the plaintiff." *Main*, 348 S.W.3d at 395; *see also Houseman v. Publicaciones Paso del Norte, S.A.*, 242 S.W.3d 518, 525 (Tex. App.—El Paso 2007, no pet.) ("A publication is 'of and concerning the plaintiff' if persons who knew and were acquainted with him understood from viewing the publication that the defamatory matter referred to him.").

Here, the column did not mention Paul or the Tatums by name. But, after discussing a situation three months earlier in which a famous person's company falsely reported his suicide as an apparent heart attack, it did say that a recent suicide was described in an obituary as having been the result of a car accident:

> More recently, a paid obituary in this newspaper reported that a popular local high school student died "as a result of injuries sustained in an automobile accident."

–10–

Thus, a threshold question is whether the Tatums presented evidence sufficient to raise a genuine fact issue as to whether people who knew the Tatums would reasonably understand that the column referred to them. For the reasons discussed below, we conclude that they did.

The Tatums' response relied on the following evidence:

One, John Tatum testified by affidavit that his friend Lee Simpson called to inform him about the column the day it was published.

Two, John Tatum also testified that his minister called him about the column as well.

Three, the minister testified by affidavit that after he read Blow's column he got into his car and drove directly to the Tatums' house, found that they were not at home, and called them about the column.

These affidavits create a reasonable inference that persons who knew the Tatums also knew that the column referred to them.

Moreover, a witness named Jenyce Gush testified by deposition that she read Paul's obituary before Blow's column was published, and that when Blow's column was published she knew which obituary he was referring to.

Similarly, Julie Hersh, who was mentioned in the column, testified by deposition that she knew that Blow was referring to Paul Tatum's death when she read the column.

The Tatums also filed copies of a number of emails bearing on the subject. One was an email to Blow in which the author wrote, "He [Paul] was a popular and accomplished young man and many people understood to whom you referred."

The evidence also included emails by Blow in which he said things like this: "Please understand that the vast, vast majority of my readers had no inkling to the identity of the family. And those who did know were already aware of the confusion caused by the obituary. My column told them nothing they didn't already know." And, in his deposition, Blow testified that

he thought that people who knew both what the obituary said and that Paul shot himself would recognize the reference in his column.

Viewing the evidence in the light most favorable to the Tatums, we conclude that a reasonable person could find that people who knew the Tatums would reasonably understand that the column referred to the Tatums.

Our decision in *Backes v. Misko*, No. 05-14-00566-CV, 2015 WL 1138258 (Tex. App.—Dallas Mar. 13, 2015, pet. denied), further supports this conclusion. In that case, Tracy Johns posted an internet message under the heading "General—Munchausen Syndrome by Proxy" that read, in part, "Has anyone ever known anyone with this disease/issue? If you have STRONG suspicions . . . to whom do you turn them over?" *Id*. at *4. Karen Misko took the post to be directed at her and sued Johns for libel. *Id*. at *5. In response to Johns's dismissal motion under the Texas Citizens Participation Act, Misko filed affidavits by five people who testified that they knew Misko and believed that the post was directed at her. *Id*. at *13. We held that these affidavits provided clear and specific evidence that the post was about Misko, even though Misko was not named in it. *Id*. at *13–14. Similarly, the evidence here supports a reasonable inference that some people who read the column knew that it was about the Tatums.

Accordingly, neither a traditional nor a no-evidence summary judgment could properly be granted against the Tatums on the theory that the column was not about them.

### 4. Did the Tatums raise a genuine fact issue regarding whether the column was capable of defaming them?

Whether a publication is capable of a defamatory meaning is initially a question for the court. *Turner*, 38 S.W.3d at 114. If a publication is of ambiguous or doubtful import, however, the jury must determine its meaning. *Id*. We construe an allegedly defamatory publication as a whole, in light of the surrounding circumstances, based on how a person of ordinary intelligence would perceive it. *Id*.

Again, a statement is defamatory if it tends to (i) injure the subject's reputation, (ii) expose him to public hatred, contempt, ridicule, or financial injury, or (iii) impeach his honesty, integrity, or virtue. *Am. Heritage Capital*, 436 S.W.3d at 875. Even if the statements in a publication are not defamatory when taken individually, a publication can be defamatory if it creates a defamatory impression by omitting material facts or juxtaposing facts in a misleading way. *Turner*, 38 S.W.3d at 115.

Appellees make a threshold argument that the Tatums must satisfy the standard for libel *per se* because they did not plead or prove libel *per quod* or special damages. We disagree.

Libel *per quod* is simply libel that is not actionable *per se*. *See Hancock v. Variyam*, 400 S.W.3d 59, 64 (Tex. 2013) ("Defamation *per quod* is defamation that is not actionable *per se*."). The Tatums' live pleading asserted "Libel" as count 1 and "Libel *per se*" as count 2. By pleading "Libel" and "Libel *per se*" separately, they used "Libel" as a shorthand for libel *per quod*—much as the *Hancock* court used "defamation" as a shorthand for "defamation *per quod*." *See id*. at 62 ("In this defamation suit involving two physicians, we clarify a longstanding distinction between defamation and defamation *per se* . . . ."). We thus conclude that the Tatums pled claims for both libel *per quod* and libel *per se*.

Appellees also argue on appeal that any libel *per quod* claim fails because the Tatums did not plead or prove special damages. Because we see no matching argument in appellees' amended motion for summary judgment, that argument is not properly before us. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) ("A motion [for summary judgment] must stand or fall on the grounds expressly presented in the motion.").

Turning to the "defamatory meaning" question, the Tatums argue that the column is capable of defaming them because ordinary readers could perceive it to (i) accuse them of committing deception by fabricating a connection between Paul's car accident and his suicide to

–13–

"shroud" his suicide in secrecy, (ii) suggest that Paul suffered from a mental illness and the Tatums turned a blind eye to it, and (iii) suggest that the Tatums prevented a "timely intervention" that might have saved Paul's life if only they had been honest. Appellees, however, counter that no ordinary reader would think the column defames the Tatums. They also argue that the column contains only nonactionable rhetorical hyperbole in the course of advocating societal change. We agree with the Tatums on all three points.

As to the Tatums' first point, we agree that the column is capable of a defamatory meaning about them because a person of ordinary intelligence could read the column to accuse the Tatums of deception about the cause of Paul's death and a statement is defamatory if it impeaches a person's honesty or integrity. *See* CIV. PRAC. § 73.001; *Am. Heritage Capital*, 436 S.W.3d at 875.

Generally speaking, the column's italicized words quoted above reflect a theme of alleged dishonesty by people, including those who wrote Paul's obituary, who refuse to acknowledge that someone committed suicide. More specifically, the column's first four paragraphs state Blow's opinion that people generally consider a death by suicide "worthy of deception" and mention "honesty" and being "open" about other causes of death.

The next seven paragraphs describe two recent occurrences meant to illustrate Blow's point—the events surrounding the deaths of Ted Pillsbury and Paul Tatum. The account about Pillsbury states that "his company" fabricated reports that Pillsbury had suffered a heart attack when actually he had shot himself to death.

Next, specifically as to Paul's death, Blow wrote that the paid obituary said Paul died "as a result of injuries sustained in an automobile accident," but Paul's death "turned out to have been a suicide." Blow continued, "There was a car crash, all right, but death came from a self-inflicted gunshot wound in a time of remorse afterward." In the third paragraph after that

–14–

statement, Blow wrote, "I'm troubled that we, as a society, allow suicide to remain cloaked in such secrecy, if not outright deception."

The above parts alone could cause a person of ordinary intelligence to read the column as accusing the Tatums of deceit by writing an obituary that stated a false cause of Paul's death and concealed the true cause of his death (for their own self-benefit and to the detriment of society as a whole).

To accuse someone of deception is to impeach his or her honesty and integrity. *See Deception*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (1981) ("the act of deceiving, cheating, hoodwinking, misleading, or deluding"); *see also Deceive*, *id.* ("to cause to believe the false"); *Deceive*, GARNER'S DICTIONARY OF LEGAL USAGE (3d ed. 2011) ("to induce someone to believe in a falsehood"); *Deceive*, THE NEW OXFORD AMERICAN DICTIONARY (2001) ("cause (someone) to believe something that is not true, typically in order to gain some personal advantage").[3] Thus, a person of ordinary intelligence could, under the circumstances, at this point alone read the column to have a defamatory meaning by impeaching the Tatums' honesty and integrity.

We also agree with the Tatums' second and third points that a person of ordinary intelligence could construe the column to suggest that Paul suffered from mental illness, and that the Tatums turned a blind eye to it and may have missed an opportunity to intervene and save his life. Although the column does not expressly make these assertions, roughly the last third of the column discusses the prevalence of suicide (specifically among young people), laments public silence about suicide's frequent cause (mental illness), and concludes, "Awareness, frank discussion, timely intervention, treatment—those are the things that save lives. Honesty is the

---

[3] We may consult dictionaries to determine the generally accepted or commonly understood meaning of words. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010) (citing dictionaries as aids to interpreting an insurance policy).

first step." By juxtaposing Paul's story with this discussion, the column invites the reader to associate Paul's suicide with mental illness and the Tatums with those who do not engage in life saving "frank discussion" and "timely intervention." The closing line, "Honesty is the first step," also invites the reader to contrast "honesty" with a "dishonest" obituary published about Paul's death.

For the above reasons, we conclude that a person of ordinary intelligence could construe the column to suggest that Paul suffered from mental illness and his parents failed to confront it honestly and timely, perhaps missing a chance to save his life. This meaning is defamatory because it tends to injure the Tatums' reputations and to expose them to public hatred, contempt, or ridicule. *See* CIV. PRAC. § 73.001.

We are not persuaded by appellees' characterization of the column as nonactionable rhetorical hyperbole. Rhetorical hyperbole is extravagant exaggeration employed for rhetorical effect. *Backes*, 2015 WL 1138258, at *14. But appellees do not explain how the column amounts to rhetorical hyperbole. We perceive no "extravagant exaggeration" in the column. To the contrary, the column's tone is generally sober, and it purports to be grounded in factual details such as the circumstances of Pillsbury's and Paul's deaths, data about the prevalence of suicide among young people, and Julie Hersh's public efforts to reduce the shame and stigma surrounding mental illness.

Appellees also argue that the column cannot reasonably be read to suggest that Paul had a mental illness. They state that several paragraphs separate the column's description of Paul's suicide from its discussion of mental illness. They also argue that the description of Paul as "popular" is inconsistent with an imputation of mental illness, as is the assertion that he committed suicide in a "time of remorse" after a car crash. We are unpersuaded.

–16–

The distance between the column's discussion of Paul's case and its discussion of mental illness is not so great that a reader of ordinary intelligence could not connect the two, and the closing exhortation for frank discussion, timely intervention, and honesty tends to tie the end of the column back to the two specific illustrations of "deception." Saying someone is popular is not inconsistent with the premise that he is mentally ill, nor is asserting that someone committed suicide out of remorse over a car crash inconsistent with the premise that he was mentally ill.

Because we conclude that the column is capable of a defamatory meaning, there is at least a fact issue regarding this element, and appellees' traditional and no-evidence grounds attacking that element cannot support the trial court's judgment.[4]

### 5. Did the Tatums raise a genuine fact issue regarding whether the column was neither true nor substantially true?

Appellees' summary judgment motion argued that (i) they proved the column was true or substantially true and (ii) the Tatums had no evidence of any false statement of fact in the column. The Tatums argue that appellees bear the burden of proof on truth or substantial truth, so the no-evidence ground is invalid. *See* TEX. R. CIV. P. 166a(i). Because we conclude that the evidence raised a genuine fact issue regarding whether the column was true or substantially true regarding the Tatums, we need not decide which side had the burden of proof. *Cf. Neely*, 418 S.W.3d at 66 n.12 (the distinctions among the varying burdens of proof as to truth or falsity are "less material at summary judgment").

If a defamatory statement is true or substantially true, it is not actionable. *See id*. at 62; *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990). A publication is substantially true if, in the average reader's mind, the allegedly defamatory statement is not more damaging to the plaintiff's reputation than a truthful statement would have been. *Neely*, 418 S.W.3d at 63.

---

[4] This opinion should not be construed to hold that the column necessarily defamed the Tatums. Rather, we conclude only that it is capable of having that meaning.

Conversely, a publication that consists of statements that are literally true when read in isolation can still convey a false and defamatory meaning by omitting or juxtaposing facts. *Id*. at 64.

We determine substantial truth by assessing the publication's "gist." *See id*. at 63–64. A publication's gist is its main point, material part, or essence, as perceived by a reasonable person. *D Magazine Partners*, 2015 WL 5156908, at *7.

### a. What is the column's gist regarding the Tatums?

The Tatums argue that "[t]he false gist of the Column is that [they] dishonestly characterized their son's death in the Obituary as a means to 'shroud' his suicide in secrecy." The first question is whether an ordinarily intelligent person could construe the column as conveying that gist. *See Neely*, 418 S.W.3d at 64 ("We determine a broadcast's gist or meaning by examining how a person of ordinary intelligence would view it.") (footnote omitted). Although appellees contend that the column's gist does not include any comment on the Tatums' character or their actions, we disagree.

The column's headline and opening sentence announce that deception and secrecy are the column's topics. The column describes Paul's obituary and death immediately after it describes the fabricated cause of death that was advanced after Ted Pillsbury's suicide. The column then implies that the obituary's reference to the cause of Paul's death was false by saying, "There was a car crash, all right, but death came from a self-inflicted gunshot wound in a time of remorse afterward." Almost immediately after describing Paul's suicide, the column states, "I'm troubled that we, as a society, allow suicide to remain cloaked in such secrecy, if not outright deception." A reasonable reader could conclude that the column's gist is that the Tatums, as authors of Paul's

obituary, wrote a deceptive obituary to keep Paul's suicide a secret and to protect themselves from being seen as having missed the chance to intervene and prevent the suicide.[5]

### b.     Is there evidence that the column's gist was false?

We next ask whether there was evidence that the column's gist was false. The Tatums argue that there was, focusing specifically on the intent that the word "deception" implies. They argue that the column's gist includes an assertion that they falsely ascribed Paul's death to "injuries sustained in an automobile accident" with the intent to mislead and deceive readers and to cover up his suicide. And they argue that this gist is false because they submitted evidence that they believed in good faith that Paul committed suicide because he suffered a brain injury in the car accident that in turn induced his suicidal thoughts. We agree with the Tatums.

The Tatums submitted evidence showing that:

One, their motive in stating that Paul died "as a result of injuries sustained in an automobile accident" was to express their belief, after investigation, that the best explanation of the underlying cause of Paul's suicide was a brain injury sustained in the auto accident.

Two, they did not mention suicide in the obituary because (i) they believed it would give a false impression that Paul committed suicide as a result of depression or other mental illness and (ii) they did not feel it would honor Paul's memory to include morbid details about his death or to include overly scientific information.

Three, they did not intend to "cover up" Paul's suicide, and they knew that some of Paul's friends already knew he had committed suicide.

---

[5] We conclude only that a reasonable factfinder could conclude that this is the column's gist, and this opinion should not be construed to hold that this is necessarily the column's gist. That question remains to be decided by the factfinder.

### (1) Deceptive Intent.

Crediting the Tatums' evidence as we must, we conclude that a reasonable factfinder could find that the column's gist was false. We agree that the column's gist associates the obituary with "deception," which denotes an intention to deceive, often for personal advantage. *See Deceive*, THE NEW OXFORD AMERICAN DICTIONARY ("cause (someone) to believe something that is not true, typically in order to gain some personal advantage"). The gist also implies that the explanation the Tatums gave for the cause of Paul's death was false and that Paul committed suicide because of "remorse" rather than because of injuries suffered in the auto accident. And the gist includes an implication that the Tatums' motive for deceiving readers was to conceal that Paul had suffered from a mental illness that the Tatums failed to confront.

We are unpersuaded by appellees' contrary arguments. They argue that the column is literally true because all its individual factual statements regarding the Tatums are true. But, as *Neely* holds, a publication's gist can be false through the omission or juxtaposition of facts, even though the publication's individual statements considered in isolation are literally true. 418 S.W.3d at 64.

Appellees also assert that the obituary's omission of Paul's suicide shows that it was in fact a "deception." But as discussed above, "deception" implies intent to deceive, and the Tatums raised a genuine fact issue as to whether they had such an intent.

Appellees further argue that the column does not omit or juxtapose facts in such a way as to make its gist false. We disagree. The column omits the reasons why the Tatums believed their account of the cause of Paul's suicide was true. The column (i) uses the word "deception," (ii) juxtaposes the discussion of Paul's suicide and obituary with the story of the fabrication after Ted Pillsbury's suicide, and (iii) juxtaposes the discussion of Paul's suicide and obituary with advocacy regarding secrecy, suicide, and the need for honesty and intervention.

Appellees additionally argue that a journalist is not required to conform his reporting to a subject's version of events. Nonetheless, a journalist may not omit and juxtapose facts in such a way as to make the facts reported convey a false gist or meaning. *See id.*

Based on their view of the column's gist, appellees next argue that the cause of Paul's suicide and the Tatums' belief about that cause are irrelevant to the issue of truth. We are not persuaded. The column's gist is not simply that the Tatums omitted the fact that Paul committed suicide from the obituary. The gist is that they stated a false cause of death, shrouded Paul's suicide in secrecy, intended to mislead and deceive the readers, and may have wanted to conceal Paul's mental illness and their own failure to intervene.

Accordingly, the Tatums submitted enough evidence to raise a genuine fact issue regarding whether they believed what they said in the obituary was true, did not intend to mislead or deceive anyone, and did not believe Paul suffered from mental illness.

### (2)    Brain Injury as Causing the Suicide.

Appellees also argue that there is no evidence to support the Tatums' theory that a brain injury made Paul suicidal. This argument misses the point. The truth of the column's gist hinges on whether the Tatums intended to deceive when they wrote the obituary, not necessarily on the strength of the scientific evidence supporting their belief about the cause of Paul's suicide.

Nonetheless, the Tatums filed affidavits by two experts. One expert explained the severity of Paul's auto accident, and the other opined that Paul committed suicide because of a brain injury sustained in that accident. Appellees made objections to the affidavits in the trial court, which the trial court overruled. On appeal, appellees argue only that the affidavits are too speculative. *See Duncan-Hubert v. Mitchell*, 310 S.W.3d 92, 103 (Tex. App.—Dallas 2010, pet. denied) (objection that opinions are speculative can be raised for the first time on appeal). We conclude otherwise.

Specifically, the first affidavit is by Dr. Robert Cargill, who possesses a Ph.D. in bioengineering. His testimony demonstrates his training and expertise in the field of accident reconstruction. He reviewed "black box" recorder data from the Tatums' vehicle that was involved in the accident, reviewed photographs of the vehicle, and interviewed the person who inspected the vehicle after the accident. Based on his investigation, he concluded that the primary impact involved in the accident was "moderate to severe," and that the accident was severe enough that "it would have subjected a human occupant of the vehicle to, at a very minimum, the risk of a mild TBI [traumatic brain injury], such as a concussion."

The other affidavit is by Dr. Joseph Kass, a medical doctor and neurologist who possesses expertise in neurocognitive disorders such as traumatic brain injuries. Kass reviewed Cargill's report about the accident, interviewed the Tatums, reviewed Paul's conduct before and after the accident as reported by his friends, and reviewed other documents such as Paul's medical history and death certificate. Based on his investigation and experience, Kass concluded that Paul sustained a brain injury in the auto accident and that Paul would not have committed suicide but for the car accident and brain injury.

Based on the above, we conclude that the expert affidavits are not speculative and the trial court did not err by overruling appellees' objections. Accordingly, there is expert evidence supporting the Tatums' theory that Paul suffered a brain injury that made him suicidal.

### c. Was the column's gist substantially true?

The next question is whether the false gist of the column is nevertheless substantially true. As explained above, a false gist is substantially true and nonactionable if it is no more damaging to the plaintiff's reputation than a truthful publication would have been. *See Neely*, 418 S.W.3d at 63. Thus, if the column's false gist—that the Tatums wrote Paul's obituary with

the intent to deceive—is more damaging to the Tatums' reputations than a true statement would have been, then the gist is not substantially true.

We resolve this question in the Tatums' favor. A reasonable juror could conclude that a hypothetically true column would have been less damaging to the Tatums' reputation because it would have mentioned that the Tatums claimed to have written the obituary in a good faith belief in its truth and without an intent to deceive. The actual column, however, can be read to allow and encourage the reader to conclude that the Tatums had no basis for attributing Paul's death to injuries sustained in the earlier car crash and that they wanted to deceive the obituary's readers about the cause of Paul's death, perhaps to conceal their own failure to save his life through an intervention.

*Neely*'s substantial truth analysis is instructive. In that case, Dr. Neely was disciplined for self-prescribing medications, but a news broadcast about him could reasonably have been understood to report that he was actually disciplined for operating on patients while using dangerous drugs or controlled substances. *Id*. at 66. Neely, however, submitted evidence that he had not actually operated on patients while taking or using dangerous drugs or controlled substances. *Id*. at 66–67. Based on that evidence, the court concluded that a factfinder could find that the false gist—that Neely was disciplined for operating while using drugs—was more damaging to Neely's reputation than the truth—that Neely was disciplined for self-prescribing medications. *Id*. at 67–68.

Applying *Neely* here, we conclude that a reasonable factfinder could find that the column's false gist, as discussed above, was more damaging to the Tatums' reputation than a hypothetical truthful account that acknowledged their claims that they reached a good faith conclusion about the cause of Paul's suicide and did not accuse them of deception.

–23–

### d. Conclusion.

Because the evidence raises a genuine fact issue that the column's gist was neither true nor substantially true, appellees' traditional and no-evidence summary judgment grounds addressing truth and substantial truth cannot support the trial court's judgment.

**6. Did appellees establish as a matter of law that the column is privileged as a fair account of official proceedings or as a fair comment on a matter of public concern?**

By statute, a newspaper or other periodical enjoys a privilege against libel actions regarding the publication of certain matters, including (i) a fair, true, and impartial account of an official proceeding to administer the law, CIV. PRAC. § 73.002(b)(1)(B), and (ii) a reasonable and fair comment on or criticism of a matter of public concern published for general information, *id*. § 73.002(b)(2). Because these privileges are affirmative defenses, *see Denton Publ'g Co. v. Boyd*, 460 S.W.2d 881, 882, 885 (Tex. 1970) (interpreting predecessor statute to § 73.002), appellees' summary judgment motion had to conclusively prove their elements to prevail.[6]

**a. Did appellees conclusively prove the official proceeding privilege?**

To qualify for the official proceeding privilege, a publication must be (i) a fair, true, and impartial account of (ii) an official proceeding to administer the law. CIV. PRAC. § 73.002(b)(1)(B). For this privilege to apply, however, the law requires that the comment at issue "purported to be, and was, only a fair, true and impartial report of what was stated at the meeting, regardless of whether the facts under discussion at such meeting were in fact true, unless the report was made with malice." *Denton Publ'g Co.*, 460 S.W.2d at 883.

---

[6] In *D Magazine Partners* we said that the supreme court's 2000 *Turner* opinion suggests that lack of privilege might be an element of a defamation plaintiff's case, while its 2013 *Neely* opinion indicates that privilege is a defense. 2015 WL 5156908, at *6 n.6. We resolved that case, however, without deciding the issue because the placement of the burden there would not have affected the outcome.

Although *Turner* contains a passing remark in dicta that a defamation plaintiff must prove that the publication is not privileged, 38 S.W.3d at 115, it does not cite *Denton Publishing Co.* or hint that it overrules that case's holding that "privilege is an affirmative defense," 460 S.W.2d at 885. We thus conclude that *Denton Publishing Co.* is still controlling law.

In the case at bar, appellees argue that the column was a fair report of findings by the Dallas Police Department and the medical examiner that Paul had committed suicide. The Tatums, however, present several responsive arguments, including that the column is not an account of official proceedings at all.

We agree with the Tatums. Even assuming that investigations by the police and the medical examiner are "official proceedings," the column does not purport to report about those proceedings. It does not mention those proceedings, nor does it report any statements or findings made in the course of those proceedings. Thus, the column does not qualify for the official proceeding privilege. *See id.* (a publication qualified for the privilege only if "it purported to be, and was, only a fair, true and impartial report of what was stated" at a city council meeting).

### b. Did appellees conclusively prove the fair comment privilege?

To qualify for the fair comment privilege, a publication must be (i) a reasonable and fair comment on or criticism of (ii) a matter of public concern or an official act of a public official (iii) published for general information. CIV. PRAC. § 73.002(b)(2). Appellees argue that the column is a fair comment on a matter of public concern, specifically "society's tendency to avoid open discussion of suicide and how that leaves its dangers underestimated." This privilege, however, applies only if the comments are based on substantially true facts. *Neely*, 418 S.W.3d at 70.

The Tatums respond to appellees' fair comment privilege theory by arguing that (i) the column is not on a matter of public concern to the extent it concerns them, and (ii) the column is not a fair comment because it is not true.

We agree with the Tatums' second argument and thus do not address their first.

–25–

We have already concluded that a reasonable reader could conclude that the column presents a false gist about the Tatums. That is, as *Neely* illustrates, enough to raise a genuine fact issue on the fair comment privilege.

The *Neely* court explained the fair comment privilege as follows:

> Comments based on substantially true facts are privileged if fair; comments that assert or affirm false statements of fact are not privileged. We long ago stated that it "is the settled law of Texas, that a false statement of fact concerning a public officer, even if made in a discussion of matters of public concern, is not privileged as fair comment."

*Id.* (quoting *Bell Publ'g Co. v. Garrett Eng'g Co.*, 170 S.W.2d 197, 204 (Tex. 1943)). Because the evidence in *Neely* raised a genuine fact issue as to whether a news broadcast was substantially true, the court held that the defendants were not entitled to summary judgment based on the fair comment privilege. *Id.*

Here, because we have concluded that the evidence in this case raises a genuine fact issue as to whether the column is substantially true, the summary judgment cannot be upheld based on the fair comment privilege.

**7.      Are the column's statements about the Tatums nonactionable opinions?**

We next consider appellees' summary judgment ground that the column contains only nonactionable opinions. The test here is whether the defamatory statement is verifiable as false. *See id.* at 62 ("[S]tatements that are not verifiable as false cannot form the basis of a defamation claim."); *see also Bentley v. Bunton*, 94 S.W.3d 561, 579–85 (Tex. 2002) (accusations that a judge was "corrupt" were sufficiently verifiable to constitute actionable statements of fact). Whether a statement is a statement of fact or opinion is a question of law. *Am. Heritage Capital*, 436 S.W.3d at 875.

The Tatums argue that an accusation of deception is verifiable and therefore actionable, while appellees argue that it is not. We agree with the Tatums.

In adopting the "verifiable as false" test in *Bentley* and *Neely*, the Texas Supreme Court relied on the United States Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). In that case, Milkovich sued Lorain for publishing an article that essentially accused him of perjury. *See id.* at 4–7. Milkovich lost on summary judgment and appealed all the way to the Supreme Court. *Id.* at 10. The Supreme Court reversed the summary judgment against Milkovich, explaining the verifiable-as-false test as follows:

> Foremost, we think *Hepps*[7] stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved. Thus, unlike the statement, "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," would not be actionable. *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.

*Id.* at 19–20 (footnotes omitted).

By using the statement "In my opinion Mayor Jones is a liar" as an example of an actionable statement of fact, the Court took the position that such a statement can be proven false. Later in the opinion, the Court held that the defendant's statement that Milkovich committed perjury was "sufficiently factual to be susceptible of being proved true or false." *Id.* at 21.

Similarly, in *Bentley* the Texas Supreme Court considered whether repeated statements that a particular judge was "corrupt" were nonactionable statements of opinion. 94 S.W.3d at 583. Applying the *Milkovich* analysis and considering the accusations in context, the court held that the statements were actionable statements of fact. The court noted that the defendant had repeatedly stated that his accusations of corruption were based on objective, provable facts and on evidence that he had seen. *Id.* at 583–84.

---

[7] *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986).

In light of *Milkovich*, *Neely*, and *Bentley*, we conclude that the column's gist that the Tatums were deceptive when they wrote Paul's obituary is sufficiently verifiable to be actionable in defamation. Calling someone a liar and accusing someone of perjury, as occurred in those cases, both implicate the person's mental state, because both "liar" and "perjury" denote the willful telling of an untruth. Nevertheless, the *Milkovich* Court concluded that calling someone a liar and accusing someone of perjury are both sufficiently verifiable to support a defamation claim. 497 U.S. at 19–21.

In the present case, the column's implicit assertion that the Tatums committed deception is similar—an accusation that the Tatums willfully wrote a misleading obituary for the purpose of deceiving readers, possibly to protect themselves from suspicion of being negligent or inattentive parents. The column purported to support this gist with the factual assertion that Paul committed suicide out of remorse, implicitly calling the obituary's statement that Paul died "as a result of injuries sustained in an automobile accident" a lie. Although the Tatums' mental states when they wrote the obituary may not be susceptible of direct proof, we conclude that they are sufficiently verifiable through circumstantial evidence, such as the investigation into the possible causes for Paul's suicide that the Tatums undertook, to make the column's defamatory gist about them verifiable under *Milkovich* and *Neely*.

Specifically, the following circumstantial evidence bears on, or could have affected, the Tatums' state of mind when they wrote the obituary and supports the verifiability of the column's gist: (i) the Tatums searched for answers to the question of why Paul did it; (ii) both Tatums—and we note that Mary Ann Tatum is a mental health professional—testified that Paul had no history of mental illness associated with suicidal behavior; (iii) Paul left no suicide note; (iv) Paul's texts to friends after the accident made it seem that something had happened in the accident to change his state of mind; (v) the vehicle's condition made it seem probable that Paul

hit his head in the accident; and (vi) the Tatums researched online and discovered that emerging scientific data links brain injury to suicidal behavior.

Appellees, however, cite several cases from other jurisdictions to support their argument that the column's gist is an unverifiable opinion. For the reasons discussed below, we conclude that their cases are distinguishable or otherwise unpersuasive.

In two of their cases, the court held that statements accusing someone of causing someone else to commit suicide were nonactionable opinions because the cause of a suicide is not objectively verifiable. *Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1147–48 (8th Cir. 2012); *Scholz v. Bos. Herald, Inc.*, No. SUCV201001010, 2013 WL 4081413, at *9–12 (Mass. Super. Ct. Mar. 29, 2013), *aff'd*, 41 N.E.3d 38 (Mass. 2015). These cases are distinguishable because the case before us does not turn on the verifiability of the column's statement about the cause of Paul's suicide. Rather, this case turns on the verifiability of the column's accusation of deception against the Tatums. Accordingly, *Gacek* and *Scholz* are not on point.

Appellees also direct us to *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993). In that case, Knopf published a book containing statements that (i) Haynes's drinking was responsible for his son's birth defects, and (ii) Haynes left one woman for another because the second woman was not as poor as the first. *Id*. at 1226–27. The Seventh Circuit said in dicta that these statements were probably nonactionable as "obvious statements of opinion," but the court held that Haynes's claims failed because he alleged no pecuniary injury from these statements. *Id*. We are not necessarily convinced that Knopf's first statement about Haynes was an unverifiable opinion. Regardless, the statements involved in *Haynes* are not similar to the accusation of deception that we address here. *Haynes* is distinguishable.

Finally, appellees cite *West v. Thomson Newspapers*, 872 P.2d 999 (Utah 1994). West successfully ran for mayor of a Utah town. *Id*. at 1000–01. After West's election, Thomson ran columns asserting that before the election West had opposed a proposal that the town should purchase a municipal power system, but that he changed his position after he was elected. *Id*. at 1001 & n.1. West sued for defamation, he lost the case on summary judgment, and the case came before the Utah Supreme Court. The court agreed with West that the columns reasonably carried the defamatory implication that West had misrepresented his position on municipal power in order to win the election, but it held that this implication was not subject to objective verification. *Id*. at 1019. Accordingly, the court held that the columns were nonactionable opinions. *Id*. at 1020. To the extent *West* is similar to the instant case, we disagree with it.

Although the *West* court acknowledged and purported to apply the *Milkovich* analysis, it disregarded *Milkovich*'s conclusions that accusing a person of being a liar or committing perjury can be sufficiently verifiable to constitute an actionable statement of fact rather than a nonactionable opinion. Our supreme court, however, has embraced the *Milkovich* verifiability test. *See Neely*, 418 S.W.3d at 62; *Bentley*, 94 S.W.3d at 579–85. We therefore decline to follow *West*.

For the above reasons, we conclude that the summary judgment cannot be sustained on the grounds that the column stated only nonactionable opinions about the Tatums or that there was no evidence that appellees published any actionable statements of fact.

**8.      Did the Tatums raise a genuine fact issue that appellees acted with the necessary degree of culpability?**

Appellees' summary judgment motion argued that they conclusively negated the element of actual malice, that the Tatums could produce no evidence of actual malice, and that the Tatums could produce no evidence of negligence if that standard applied. On appeal, the Tatums argue that they (i) are required to prove only negligence because they are not public figures and

–30–

(ii) produced sufficient evidence of both actual malice and negligence. We agree with the Tatums.

### a. Applicable Law.

Under Supreme Court precedents, a defamation plaintiff must prove that the defendant acted with actual malice if the plaintiff is a public official, a public figure, or a limited-purpose public figure. *Neely*, 418 S.W.3d at 61. In this context, "actual malice" means knowledge of, or reckless disregard for, the falsity of a statement. *Bentley*, 94 S.W.3d at 591; *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). "Reckless disregard" means that the publisher entertained serious doubts about the publication's truth or had a high degree of awareness of the publication's probable falsity. *Bentley*, 94 S.W.3d at 591.

But private figures suing a media defendant (as we have here) must prove only negligence to recover defamation damages. *See Neely*, 418 S.W.3d at 61. In this context, negligence has two prongs: (1) the publisher knew or should have known that the defamatory statement was false, and (2) the factual misstatement's content was such that it would warn a reasonably prudent editor or broadcaster of its defamatory potential. *See id*. at 72.

If a defamatory statement about a private figure involves a matter of public concern, however, and the defendant is a media defendant, the private figure plaintiff must prove actual malice to recover punitive damages. *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156–57 (Tex. 2014) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974)).

Public figure status is a question of law for the court. *Neely*, 418 S.W.3d at 70. Appellees, however, do not contend that the Tatums are public officials or general-purpose public figures. *See Pickens v. Cordia*, 433 S.W.3d 179, 185 (Tex. App.—Dallas 2014, no pet.) (describing general-purpose public figures as those who have achieved such pervasive fame or

–31–

notoriety as to be public figures for all purposes). We therefore do not address whether those categories apply here.

Limited-purpose public figures are generally people who have thrust themselves to the forefront of a particular public controversy to influence its resolution, or who have voluntarily injected themselves or been drawn into a public controversy. *Id*. at 187. We employ a three-part test to assess whether a plaintiff is a limited-purpose public figure:

> (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

> (2) the plaintiff must have more than a trivial or tangential role in the controversy; and

> (3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*WFAA-TV, Inc.*, 978 S.W.2d at 571.

We do not consider the defamatory statement itself in determining whether the plaintiff is a public figure. *See Neely*, 418 S.W.3d at 71 ("[T]he allegedly defamatory statement cannot be what brought the plaintiff into the public sphere; otherwise, there would be no private figures defamed by media defendants.").

### b. Are the Tatums limited-purpose public figures?

Based on the record before us, we conclude that the Tatums were not limited-purpose public figures. Appellees' contrary argument fails on the first prong we referenced above—the existence of a public controversy for the Tatums to participate in.

Appellees argue that a public controversy existed over the official cause of Paul's death. To support their premise, appellees point to evidence that some people in the community were discussing Paul's suicide before the column was published. But a topic is not a public controversy merely because some people are talking about it:

–32–

> A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.

*WFAA-TV, Inc.*, 978 S.W.2d at 572. In short, there must first be a controversy before it can be a public one.

And, for a matter to be a public controversy, its resolution must affect people beyond its immediate participants. *See id.* at 571; *see also Einhorn v. LaChance*, 823 S.W.2d 405, 411 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.) ("A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way.").

Although there is evidence that people in Paul's high school community were discussing his death generally, and that unspecified others in north Dallas were also discussing it before the column was published, there is no evidence that the cause or manner of Paul's death affected anyone other than the Tatums.

Similarly, although there is evidence that the Tatums disagreed with the "manner of death" finding of suicide on Paul's death certificate and tried to persuade the medical examiner to change it, there is no evidence that the outcome of this alleged controversy affected anyone except the Tatums.

Accordingly, because there is no evidence of a public controversy that could make the Tatums limited-purpose public figures, we conclude that the Tatums are private figures for purposes of this summary judgment appeal. Thus, they must prove only negligence to recover compensatory damages. *See Neely*, 418 S.W.3d at 61.

But the Tatums must prove actual malice to recover exemplary damages if the defamatory statement involved a matter of public concern (as opposed to a public controversy) and appellees are media defendants. *See Waste Mgmt. of Tex., Inc.*, 434 S.W.3d at 156–57.

–33–

"Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public . . . ." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotations and citations omitted).

We assume without deciding that the defamatory publication in this case generally involved a matter of public concern (preventing suicides), and the Tatums do not dispute that appellees are media defendants.

### c. Did the Tatums raise a genuine fact issue as to negligence and actual malice?

The Tatums argue that the following evidence raises a genuine fact issue as to the elements of negligence and actual malice:

• An expert witness testified by affidavit that appellees' failure to contact the Tatums for an explanation of the obituary before publishing the column fell short of journalistic standards promulgated by DMN and by the Society of Professional Journalism.

• The summary judgment evidence conflicts on certain points regarding the newspaper's investigation into Paul's death and the manner in which Blow learned about the immediate cause of Paul's death. For example, the internal sources that Blow said he contacted before publishing the column denied having discussed the matter with him.

• Blow testified that he did not review any documents regarding Paul's death or the car accident earlier that night, did not interview anyone with the Dallas Police Department or the medical examiner's office, and did not attempt to contact the Tatums before drafting the column.

• Finally, the Tatums point to their minister's testimony that he called Blow to express his concerns about the column and that Blow's first response was, "Did I get my facts right?"

–34–

### (1) Negligence.

We conclude that the evidence raised a genuine fact issue as to negligence. Specifically, the Tatums produced evidence that Blow did not contact them to determine the basis for their choice of words in Paul's obituary, and that this failure to contact them was a breach of journalistic standards and the newspaper's own policies. There was also evidence from which a reasonable jury could find that a proper investigation would have revealed that the Tatums had a good faith belief that Paul's death was in fact caused by injuries sustained in a car accident. There is thus some evidence from which a reasonable factfinder could find negligence's first prong—that appellees should have known of the defamatory statement's falsity, but failed to use reasonable care to ascertain the truth of the column's gist. *See Neely*, 418 S.W.3d at 72.

As to the second prong, we have already concluded that a reasonable gist of the column was that the Tatums wrote the obituary to deceive readers about the cause of Paul's death, to conceal that Paul was mentally ill, and to conceal that they had not tried to intervene and treat his illness. These matters create a genuine fact issue regarding whether the column's contents would have warned a reasonably prudent publisher of its defamatory potential. *See id.*

### (2) Actual Malice.

We also conclude that the evidence raises a genuine fact issue as to actual malice. We acknowledge that evidence of a negligent investigation, standing alone, does not raise a fact issue on actual malice:

> [T]he failure to investigate the facts before speaking as a reasonably prudent person would do is not, standing alone, evidence of a reckless disregard for the truth, but evidence that a failure to investigate was contrary to a speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard required for actual malice.

*Bentley*, 94 S.W.3d at 591 (footnotes omitted).

But the Tatums adduced evidence of more than a mere negligent investigation. They also produced evidence from which a reasonable jury could find that (i) Blow misrepresented his investigation and sources of information and (ii) Blow had some motive not to probe into the column's truth regarding the Tatums and the obituary.

As to whether Blow misrepresented his investigation and the sources of his information, Blow testified by deposition that he learned the information about Paul's death that he used in his column from one of his colleagues at DMN. He testified that he knew that Bruce Tomaso and Kevin Sherrington looked into Paul's death, and that he could not remember specifically which of them provided him with the information he used in the column. But Tomaso and Sherrington were also deposed, and they both testified that they did not remember having a conversation with Blow about Paul's death. A reasonable juror could conclude that Blow was not honest when he testified about the sources of his information about Paul's death. This is some evidence of actual malice. *See Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1070–71 (5th Cir. 1987) (courts have upheld actual malice findings when "the supposed source of the story disclaimed giving the information"); *see also Celle v. Filipino Reporter Enter., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (defendant's self-contradictory testimony about the source of his information supported actual malice finding).

There was also evidence that Blow did not adhere to his usual practice of investigation when he wrote the column. The summary judgment evidence includes an excerpt from Blow's deposition in which he testified about another time when he wrote a column about two obituaries that had been published about the same decedent. On that occasion, he said, he attempted to contact the author of one of the obituaries. But, here he did not attempt to contact the Tatums before publishing the column at issue in this case. Blow explained that he acted differently in investigating this column because he had been told that Paul's family did not want to discuss the

–36–

matter. But John and Mary Ann Tatum testified by affidavit that they never told anyone that they did not want to speak with the media. The Tatums' friend Lee Simpson testified by affidavit that he was contacted by Tomaso about Paul's death and that Tomaso did not ask him whether the Tatum family wanted to be contacted. Thus, there is evidence that Blow did not investigate this column with the same thoroughness that he did for a previous column and that his explanation for the difference was not true.

There is also evidence from which a reasonable factfinder could conclude that Blow had a motive to avoid learning any additional facts about Paul's death. In his affidavit, Blow said that he wrote the column to express his opinion that "it is troubling that society allows suicide to remain cloaked in secrecy and deception, and that secrecy about suicide leaves us greatly underestimating the danger of it." He also testified by deposition that if he discovered "a deception, a misleading obituary, that's fair game for commentary." Additionally, Julie Hersh testified by deposition that she met with Blow before he published the column and that they were both "outraged" by the lack of discussion about suicide. Thus, Blow had a motive not to learn if there was any explanation for the way the Tatums chose to write the obituary other than the supposed desire to deceive the obituary's readers. Had he investigated further and learned facts suggesting that the Tatums had no intent to deceive, this would have undercut the whole thrust of the column, which began with a reference to deception and ended with a call for honesty.

We conclude that there was more than a scintilla of evidence showing more than a mere failure to conduct a reasonable investigation. Viewed in the light most favorable to the Tatums, the evidence raised a genuine issue of material fact as to the actual malice element.

### 9. Conclusion

We sustain the Tatums' first issue. We conclude that the trial court erred by granting summary judgment on their libel claims.

**B.      Issue Two:  Did the trial court err by dismissing the Tatums' DTPA claims?**

In their second appellate issue, the Tatums contend that the trial court erred by granting summary judgment on their DTPA claims against DMN.  We disagree and affirm the judgment as to those claims.

**1.      Applicable Law and Summary Judgment Grounds.**

The Tatums' DTPA claims are based on § 17.46(b)(24) of the DTPA, which provides that it is a false, misleading, or deceptive act or practice to "fail[] to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."  TEX. BUS. & COM. CODE ANN. § 17.46(b)(24) (West 2011).  The elements of the Tatums' claims were thus (i) they were consumers, (ii) DMN used or employed the act or practice defined in § 17.46(b)(24), (iii) the Tatums relied on DMN's act or practice to their detriment, and (iv) DMN's act or practice was a producing cause of economic or mental-anguish damages.  *See id*. § 17.50(a)(1)(A)–(B).

DMN asserted the following traditional summary judgment grounds against the Tatums' DTPA claims:

- The Tatums are not consumers.

- DMN did not commit a false, misleading, or deceptive act that the Tatums relied on.

- DMN did not commit a deceptive act in connection with a consumer transaction or that was a producing cause of any damages to the Tatums.

DMN also asserted the following no-evidence grounds:

- There was no evidence that the Tatums were consumers.

- There was no evidence DMN committed a false, misleading, or deceptive act listed in § 17.46(b), or that the Tatums relied on any complained of act.

- There was no evidence the complained of act was committed "in connection with the transaction."

–38–

- There was no evidence the complained of act was a producing cause of the Tatums' damages.

**2. Did the Tatums raise a genuine fact issue that DMN violated § 17.46(b)(24)?**

In our analysis of this question, we focus on DMN's second no-evidence ground and particularly the first requirement of § 17.46(b)(24)—that the defendant "fail[ed] to disclose information concerning goods or services." *Id.* § 17.46(b)(24); *see also Brennan v. Manning*, No. 07-06-0041-CV, 2007 WL 1098476, at *4 (Tex. App.—Amarillo Apr. 12, 2007, pet. denied) (mem. op.) (the undisclosed information must be about the goods or services being rendered). We conclude that the Tatums adduced no evidence of this requirement.

The Tatums argue that the service at issue is publishing the obituary. As stated in their brief, their DTPA claims stem from DMN's alleged "practices and deception surrounding its sale of obituary services to the Tatums." They argue that the "information" DMN failed to disclose was "Mr. Blow's controversial practice of attacking obituaries." In their affidavits, both Tatums said that they would not have published the obituary as worded if they had known that DMN "had someone on staff who had a history of criticizing obituaries like Steve Blow."

The Tatums' argument fails because the "information" that DMN allegedly failed to disclose does not concern the service they bought. As the Tatums urge, the service they bought was Paul's obituary. The evidence shows that DMN published Paul's obituary, and the Tatums do not allege that the obituary itself did not conform to their order. Rather, the Tatums contend that DMN should have disclosed that its columnist, Blow, had previously written columns critical of obituaries that had appeared in the newspaper. In our view, this fact does not relate to the DMN's obituary services themselves, and thus it does not constitute "information concerning" those services, as is required by § 17.46(b)(24).

We reject the Tatums' second appellate issue.

## IV. CONCLUSION

We reverse the trial court's summary judgment to the extent it orders the Tatums to take nothing on their libel and libel *per se* claims. We affirm the judgment to the extent it orders the Tatums to take nothing on their DTPA claims. We remand the case for further proceedings consistent with this opinion.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

141017F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JOHN TATUM AND MARY ANN
TATUM, Appellants

No. 05-14-01017-CV        V.

THE DALLAS MORNING NEWS, INC.
AND STEVE BLOW, Appellees

On Appeal from the 68th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-11-07371.
Opinion delivered by Justice Whitehill.
Justices Lang and Fillmore participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** the trial court's judgment to the extent it orders that appellants John Tatum and Mary Ann Tatum take nothing on their libel and libel *per se* claims.

In all other respects, the trial court's judgment is **AFFIRMED**.

We **REMAND** this cause to the trial court for further proceedings.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 30th day of December, 2015.