

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-15-00239-CV

JAY W. HAND                                                    APPELLANT

V.

HARRIS HUGHEY                                                 APPELLEE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 14-08039-367

----------

## MEMORANDUM OPINION[1]

----------

This is an interlocutory appeal[2] from a ruling under the anti-SLAPP

provisions contained in chapter 27 of the civil practice and remedies code, also

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(12) (West Supp. 2015).

known as the Texas Citizens' Participation Act (TCPA).[3]  In one issue, appellant Jay W. Hand appeals the trial court's order denying his motion to dismiss the defamation suit filed against him by appellee Harris Hughey.  We affirm the trial court's order denying Hand's motion to dismiss.

**Background Facts**

Hand is a justice of the peace in Denton County.  He first held that office in 2006.  He has won elections for the office three times.  In 2014, four people, including Hand and Hughey, were primary Republican candidates for the office.  No candidate received fifty percent of the votes in the initial primary election, so Hand and Hughey, as the top two vote-getters, entered a runoff.

For the May 2014 runoff, Hand hired a consultant, Sorrell Consulting.  He also hired an attorney.  He later explained that he did so because Hughey "was very sophisticated[,] he was an attorney[, and] he had spent a considerable amount of money on professional consultants.  And if I'm going to compete on that plane, I had to do likewise."  Leading up to the runoff election date, Hand and the consultant worked on creating a flyer that concerned, among other matters, Hughey's history of voting in elections.  After Hand and the consultant

---

[3]*See id.* §§ 27.001–.011 (West 2015). "SLAPP" stands for Strategic Lawsuit Against Public Participation.  *See In re Lipsky*, 411 S.W.3d 530, 536 n.1 (Tex. App.—Fort Worth 2013, orig. proceeding), *mand. denied*, 460 S.W.3d 579 (Tex. 2015); *see also Bilbrey v. Williams*, No. 02-13-00332-CV, 2015 WL 1120921, at *7 (Tex. App.—Fort Worth Mar. 12, 2015, no pet.) (mem. op.) (explaining the origin and purpose of anti-SLAPP laws).

exchanged several e-mails about the content of the flyer, the following flyer was mailed to Denton County residents:



This flyer repeated two allegations that Hand had made in advertisements he had authorized before the date of the runoff: (1) before 2014, Hughey had never voted in a Republican primary;[4] and (2) the only election Hughey had voted in was the 2008 general election. Hand's expressed intent in mailing this flyer was to inform "hard-core sophisticated voters" that Hughey did not have a history of voting in Republican primaries. Before the mailing of the flyer, Hand expressed concern to the consultant that he did not want Hughey's "VOTING HISTORY" on the flyer to look fabricated. Hand agreed that he timed the mailing

---

[4]Hughey's counsel stated in the trial court, "[W]e don't have an issue with the [statement in the flyer that Hughey] didn't vote in Republican primaries."

of the flyer in such a way that Hughey did not have an opportunity to respond to it with his own flyer before the date of the runoff.

On May 20, 2014, after the mailing of the flyer, Hand and Hughey participated in a debate that about seventy-five people attended. During the debate, according to one person who was there, Hughey showed the audience a copy of Hand's flyer and then showed the audience a document reflecting Hughey's actual voting record. Hughey told the audience that Hand's representations about Hughey's voting record were false. Hughey later wrote in an affidavit,

> At the [debate], both candidates were asked if they had run a reputable campaign. In response to this question, I held out certified copies of my voting records from both Denton County and Tarrant County to refute the misrepresentations from J Hand's campaign flyer that the only time I had ever voted was in 2008. When I held out the voting records, I held them at arm's length and turned from side to side, including turning towards J Hand who was seated very closely. I also invited anyone in attendance to come forward to inspect the documents. When I sat down after answering the question, the documents were left out and were within arm's length of J Hand and available to him.[5]

Hand agrees that at the debate, Hughey "objected to [Hand's] calling attention to the fact that [Hughey] had not voted in the Republican primary before." Hand recalls that Hughey "took a piece of paper out of his pocket and

---

[5]Hughey also wrote that after he showed his voting record to Hand, Hand remarked to the crowd, "[W]ho carries around their voting record anyway?"

waved it around and said, 'Here's my voting record'[6] . . . and stuck it back in his pocket. He didn't present it to anybody. There [were] no specifics, no nothing." Hand remembers Hughey stating at the debate that Hand was misrepresenting Hughey's voting record. Hand testified that he asked to see Hughey's records that day but that Hughey did not present them to him or to anyone else.

The next day, someone involved with the Hand campaign uploaded a video to YouTube. The campaign also linked the video to the campaign's Facebook page. In the video, Mark Pavlovich, a precinct chair and one of Hand's supporters, stated, "Prior to this year, Judge Hand's opponent has never voted in a Republican primary election. In fact, the only time he has voted was in 2008, when Barack Obama was elected president." While Pavlovich spoke these words, the video showed a copy of Hand's flyer about Hughey.

After Hughey claimed that Hand was misrepresenting Hughey's voting record, Hand did not conduct any follow-up research on that topic. He later explained that by the time Hughey disputed his statements about the voting record, there were only a few days remaining in the election process. Hand stated, "I was too busy with other things to be doing minuscule research on things that were merely statements. . . . In an election, there are many things said. Nobody researches every bit of it. . . . [A]fter you've jumped off the cliff[,] it's too late to wonder."

_____

[6]Hand testified in a deposition that at the debate, Hughey said something to the effect of "I have the records right here."

The runoff election occurred on May 27, 2014. At a polling location that day, Donald Shields, one of Hand's supporters, nailed a copy of the flyer to a pole and displayed it. Although Hughey warned Shields that he could "end up in a lawsuit" for publishing untrue information, Shields continued to display the flyer because Hand had told him "not to worry about it."

Hand won the runoff election with 50.46% of the votes; he had 2,836 votes to Hughey's 2,784 votes. Hand later asserted in a deposition that voters choose particular candidates for many reasons and that there is "[n]o way to know" whether his statements about Hughey's voting record caused him to win the election. Hand testified, however, that he believed that he was going to lose the election before election day and that he was shocked that he won.

Months later, Hughey sued Hand.[7] He asserted that Hand had defamed him in writing (through the flyer) and verbally (through the YouTube video and through statements made to prospective voters). Hughey alleged that Hand had maliciously and deliberately "blacken[ed] [Hughey's] reputation," had attempted to expose Hughey to public contempt and ridicule, and had caused voters to believe that Hughey was unfit for public office. Hughey sought compensatory and exemplary damages.

Hand answered the suit with a general denial and by pleading specific denials and affirmative defenses. He also filed a motion to dismiss the suit under

---

[7]Hughey also sued Shields, but Shields is not a party to this appeal.

section 27.003 of the civil practice and remedies code and later amended the motion to dismiss.[8]

In these motions, Hand argued that he had made the statements that formed the basis of Hughey's defamation claims while exercising his right of free speech on a matter of public concern. He also contended that he had reasonably relied on public records while making the statements; that he did not have actual malice while making them; and that Hughey could not establish by clear and specific evidence a prima facie case for each essential element of his defamation claims, including that he had suffered damages. He argued that viewing all statements within the flyer together, the statements were either substantially true or comprised political opinions. The trial court granted limited discovery to Hughey (including the taking of Hand's deposition) on issues related to Hand's motion to dismiss.

To his response to Hand's motion to dismiss, Hughey attached copies of his voting records. The records showed that Hughey voted in eight Denton County elections from 2008 through November 2014 and voted in seven Tarrant County elections from 1990 through 2005. Hughey also attached a copy of the flyer and the YouTube video, affidavits, and deposition excerpts. Hughey contended that this evidence showed that Hand had made false statements about Hughey, that Hand had acted with actual malice in doing so, that Hughey

---

[8] *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a).

7

had suffered damages as a result of the defamation, and that damages were presumed based on the nature of the defamation.

After holding a hearing for argument, the trial court initially granted Hand's motion to dismiss. Hughey filed a motion for new trial. He contended that the rationale of the Texas Supreme Court's decision in *In re Lipsky*,[9] which clarified a plaintiff's burden to avoid dismissal under chapter 27, required the trial court to grant a new trial and to deny Hand's motion to dismiss. The trial court held a hearing on Hughey's motion for new trial, granted it, and denied Hand's motion to dismiss. Hand brought this interlocutory appeal.

## No Entitlement to Dismissal

Hand contends that the trial court erred by denying his motion to dismiss Hughey's defamation claim. We review the trial court's ruling de novo. *See United Food & Commercial Workers Int'l Union v. Wal-Mart Stores, Inc.*, 430 S.W.3d 508, 511 (Tex. App.—Fort Worth 2014, no pet.); *see also Bilbrey*, 2015 WL 1120921, at *8.

The legislature enacted the TCPA "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of [persons] to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002; *see also*

---

[9]460 S.W.3d at 590–91.

8

*Lipsky*, 460 S.W.3d at 584 (stating that the TCPA "protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them").  When a plaintiff's claim implicates a defendant's exercise of First Amendment rights, chapter 27 allows the defendant to move for dismissal.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a); *Andrews Cty. v. Sierra Club*, 463 S.W.3d 867, 867 (Tex. 2015).  But even if a claim implicates the exercise of First Amendment rights, a trial court must deny a motion to dismiss filed under chapter 27 when the plaintiff "establishes by clear and specific evidence a prima facie case[10] for each essential element of the claim in question."  Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *Andrews Cty.*, 463 S.W.3d at 867.

The clear and specific standard "neither imposes a heightened evidentiary burden nor categorically rejects the use of circumstantial evidence when determining the plaintiff's prima-facie-case burden under the Act."  *Andrews Cty.*, 463 S.W.3d at 867; *see Lipsky*, 460 S.W.3d at 591 ("In a defamation case that implicates [chapter 27], pleadings and evidence that establish[] the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss.").  In determining whether the clear and specific standard has been met,

---

[10]"Prima facie case" means the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Lipsky*, 460 S.W.3d at 590.

9

a trial court must consider the pleadings and evidence that explain "the facts on which the liability . . . is based." Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a); *see United Food & Commercial Workers Int'l Union*, 430 S.W.3d at 511–12.

Hughey concedes that Hand's speech at issue was on matters of public concern and that chapter 27 applies to that extent. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a). Hughey argues, however, that he met his burden to provide clear and specific evidence to make a prima facie case on the elements of his defamation claim. *See id.* § 27.005(c).

We have explained that to prevail on a defamation claim, the plaintiff must prove that the defendant

> (1) published a statement, (2) that was defamatory concerning the plaintiff, (3) while acting with . . . actual malice, if the plaintiff is a public official or a public figure . . . .[11] *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 526 U.S. 1051 (1999). A statement is defamatory "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pets. denied) (op. on reh'g) (citing Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011)). When actual malice is required, it may be established by proof that the defendant knew a statement was false or made the statement with reckless disregard about whether it was false, meaning that the defendant had serious doubts about the statement's truth. *McLemore*, 978

---

[11]When a plaintiff is not a public official or public figure, the plaintiff must prove negligence rather than actual malice. *See Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 81–82 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Hughey concedes that he is a public figure and that he must therefore prove that Hand acted with actual malice. Hand, as an elected official, is also a public figure.

S.W.2d at 573–74; *see also Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637–38 (Tex. 2005) (explaining that actual malice occurs when a party purposefully avoids the truth or bases a statement on obviously dubious information).

*Lipsky*, 411 S.W.3d at 543–44; *see also Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013) ("[S]tatements that are not verifiable as false cannot form the basis of a defamation claim."). In construing a statement to determine whether it was defamatory, we view it as a whole in light of surrounding circumstances based on how a person of ordinary intelligence would perceive it. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000).

**Evidence of false and defamatory statements**

Hughey produced clear and specific evidence to show a prima facie case that Hand made false statements about Hughey's voting record on the flyer displayed above and on the YouTube video that Hand's campaign posted and linked to its Facebook page. Specifically, in the flyer and video, Hand represented that the only election in which Hughey had ever voted was in 2008, when Barack Obama won the presidency. One of the flyer's graphics, which Hand represented was Hughey's "actual Voting Record," stated that from 1996 through 2012, Hughey had voted only in the 2008 general election and had not voted in any other general, primary, runoff, or special elections. The flyer also flatly stated that Hughey "DOESN'T VOTE."

In responding to Hand's motion to dismiss, Hughey presented evidence proving that these statements were false. Hughey's voting records from Denton

11

County and Tarrant County establish that he voted in various elections from 1996 through 2012. In his deposition, Hand conceded, "I was wrong, wrong, wrong, wrong." On appeal, Hand recognizes that Hughey is "correct that he . . . voted in some other elections."

The statements can also be reasonably construed as defamatory. *See Tex. Disposal Sys. Landfill, Inc.*, 219 S.W.3d at 580 (explaining that a statement is defamatory when it tends to injure a person's reputation and thereby expose the person to contempt or financial injury); *Allied Mktg. Group, Inc. v. Paramount Pictures Corp.*, 111 S.W.3d 168, 176 (Tex. App.—Eastland 2003, pet. denied) ("Statements that would ordinarily tend to injure a plaintiff's business reputation, resulting in financial injury, are defamatory."). The statements tended to injure Hughey's reputation and worthiness as a Republican candidate for public office, and therefore to negatively affect the potential that he would obtain that office and its benefits, by falsely informing potential voters that he had been almost completely uninvolved in elections for all other offices. Hand testified in his deposition that he intended for the statements in the flyer to have an impact on "hard-core sophisticated voters." In an e-mail that Hand sent to his consultant before the flyer was mailed, Hand recognized that many potential voters did not "know [him] or [Hughey] and [would] only know what [Hand presented] on [the] mailer."

Hand contends that he was only "offering an opinion that he has participated more in the relevant political party than [Hughey]." *See Transp. Care*

12

*Servs. Corp. v. Shaw*, No. 02-12-00334-CV, 2013 WL 5433991, at *3 (Tex. App.—Fort Worth Sept. 26, 2013, no pet.) (mem. op.) ("A statement must contain a verifiable fact to be defamatory. Opinions are not defamatory." (citation omitted)); *see also Tatum v. The Dallas Morning News, Inc.*, No. 05-14-01017-CV, 2015 WL 9582903, at *4 (Tex. App.—Dallas Dec. 30, 2015, pet. filed) ("[A] statement couched as an opinion may be actionable if it expressly or implicitly asserts facts that can be objectively verified."). He contends, "Read in context, the . . . flyer and campaign statements are opinions like 'I am a more active Republican than you based on your voting record' or 'I am a more involved citizen than you based on your voting record.'" We disagree. As demonstrated above, Hand's statements about Hughey's overall voting record were verifiably false, and they conveyed to potential voters that Hughey was almost wholly uninvolved in the political process, not merely less involved than Hand.

Hand also argues that the gist of the statements about Hughey's voting record was substantially true; he asserts that the flyer was accurate in stating "that Hughey rarely voted in general elections . . . [and] voted in no primary elections prior to running for office himself." *See Tatum*, 2015 WL 9582903, at *9–10 (explaining that a statement is not actionable for defamation if it is substantially true and that a court determines substantial truth by assessing a statement's gist); *Main v. Royall*, 348 S.W.3d 381, 393–94 (Tex. App.—Dallas 2011, no pet.) ("Texas law precludes liability for a publication that gets the story's 'gist' correct, but errs in the details."). We cannot agree. We conclude that the

13

false gist[12] of Hand's flyer—taken from the statements that Hughey had voted only in the 2008 general election and that he "DOESN'T VOTE"—was that Hughey was nearly wholly uninvolved in exercising his right to vote,[13] not merely that he exercised the right less often than he should have or less often than Hand had. This false gist of Hughey having essentially no voting history was likely more harmful to Hughey than truthful statements about Hughey's sporadic voting history would have been. This is particularly true given that the flyer, which was circulated for use in a Republican primary, attempted to link Hughey's 2008 vote—his alleged only vote—to the election of President Obama, a Democrat. *See Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.) ("The test used in deciding whether a statement is substantially true involves considering whether the alleged defamatory statement was more damaging to the plaintiff's reputation, in the mind of the average listener, than a truthful statement would have been."). For all of these reasons, we reject Hand's contention that Hughey did not present clear and specific evidence to make a prima facie case concerning false and defamatory statements.

---

[12]The gist of a statement is its main or material part or its essence as viewed by an ordinary and reasonable person. *D Magazine Partners, L.P. v. Rosenthal*, 475 S.W.3d 470, 482 (Tex. App.—Dallas 2015, pet. filed).

[13]Hand expressed in an e-mail to his consultant that he intended for the "VOTING HISTORY" graphic in the flyer to highlight Hughey's "*total* lack of civic involvement." [Emphasis added.]

**Evidence of actual malice**

Although Hand does not expressly argue that Hughey failed to present clear and specific evidence of actual malice, we will broadly construe Hand's brief as challenging that element of Hughey's defamation claim. *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008). A statement is made with actual malice when it is knowingly false or conveyed with reckless disregard for its truth. *Lipsky*, 460 S.W.3d at 593; *McLemore*, 978 S.W.2d at 574 (stating that "reckless disregard" may be established where a publisher has serious doubts about a statement's truth); *Tatum*, 2015 WL 9582903, at *17 (explaining that "reckless disregard" means "a high degree of awareness of the publication's probable falsity").

Hand asserted in his deposition that he had reasonably relied on his research into voting databases when making the statements about Hughey's voting record on the flyer. Specifically, he testified that at the beginning of his campaign for the 2014 election, he researched a Denton County elections database, a Tarrant County elections database, and a database from the Texas Secretary of State to learn about Hughey's voting record. Hand explained, "[T]he only election we could find any record for using two, three very credible references that we trusted was in one general election in the 2008 election. That's what we found."

But as Hughey argues, Hand continued to misstate Hughey's voting record even after Hughey asserted in the debate that Hand had done so. Hand stated

that he was too busy to verify whether his statements about Hughey's voting record were true,[14] that he did not want to do such "minuscule research," and that he had already "jumped off the cliff." After Hughey disputed the accuracy of Hand's statements in Hand's presence and represented that he held records showing that Hand's statements were false, Hand's campaign uploaded the YouTube video containing and displaying the statements, linked the video to the campaign's Facebook page, and taped notices to prospective voters' doors to alert them about the video. We conclude that this evidence is sufficiently clear and specific to make a prima facie case on actual malice at this stage of the proceedings.[15] *See Tex. Disposal Sys. Landfill, Inc.*, 219 S.W.3d at 578–79

---

[14]Lannie Noble, the Denton County Elections Administrator, swore that a record of a person's voting history is available through an open records request to his office or to the Secretary of State.

[15]We also note that Craig Murphy, a consultant that Hughey hired to help in the primary, swore in an affidavit,

> Representations on campaign flyers about a candidate should be checked against the best source available prior to publication. This is especially true when the representation is one of fact and not merely opinion. In this case, statements regarding a candidate's voting record should be verified by the county election office prior to publication to ensure accuracy. Failure to make such verification constitutes either a willful avoidance or at least a reckless disregard for the truth.
>
> . . . .
>
> . . . It has been my experience that less than truthful information, when used in a campaign, is generally used immediately prior to the vote when there is little or no time to respond. It is my opinion that J Hand, or his campaign, sent the flyer

(holding that a defendant's failure to independently verify the truth of a statement was indicative of a purposeful avoidance of truth and therefore probative of actual malice); Restatement (Second) of Torts § 580A cmt. d (1977) ("Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard."); *see also Weaver v. Lancaster Newspapers, Inc.*, 926 A.2d 899, 900, 905–06 (Pa. 2007) (citing the Restatement to conclude that republication of a statement after the defendant receives a complaint alleging that the statement is false is probative of actual malice).[16]

**Evidence of damages**

Finally, Hand argues that Hughey failed to show evidence of causation or damages. But he conditions that argument on his prior argument that "Hughey failed to provide evidence to support a prima facie finding that the statements he complains about were false, let alone defamatory." Therefore, because we have concluded that Hughey produced clear and specific evidence to make a prima

---

immediately prior to the election because he either knew it contained falsehoods or entertained serious doubts as to the veracity of the statements regarding Harris Hughey's voting record. This calculated move left Mr. Hughey with no way to correct the record prior to the election.

[16]When Hughey's counsel asked Hand in the deposition whether he had been put on notice at the debate that his statements about Hughey's voting record might have been incorrect, he said, "Absolutely."

facie case concerning false and defamatory statements, we reject Hand's conditional argument concerning evidence of damages.[17]

**The trial court's ruling**

For these reasons, we conclude that the trial court did not err by denying Hand's motion to dismiss Hughey's defamation claim because Hughey established by clear and specific evidence a prima facie case for each essential element of the claim.[18] *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *Lipsky*, 460 S.W.3d at 590–91. We overrule Hand's only issue.

---

[17]Furthermore, Murphy wrote in his affidavit,

Polling for the race showed a large number of undecided voters prior to the election. Undecided voters would have been more susceptible to the escalated attacks on Mr. Hughey's voting record because they tend to scrutinize flyers more than voters who have already determined who they intend to vote for. I also have information of a voter who switched his vote to J Hand based solely on the false representations about Mr. Hughey's general voting record and of a Republican precinct chair who sent an email to a group of Republican primary voters who were likely to vote in the runoff race voicing support for J Hand based on the same false representations. Based on these events, and my knowledge of the harm the false statements would cause to a candidate, it is my opinion that the inaccurate statements regarding Mr. Hughey's general voting record would cast him in a negative light with the more conservative voters who tend to vote in Republican primary run-off races – especially in Denton County, and would be the sole basis for some voters to vote for J Hand over Mr. Hughey.

[18]We conclude only that Hughey presented enough evidence under section 27.005(c) to maintain his defamation claim against Hand at this preliminary stage in the litigation. We do not intend to indicate an opinion about whether Hughey's claims will ultimately have merit.

## Conclusion

Having overruled Hand's sole issue, we affirm the trial court's order denying his motion to dismiss Hughey's claim for defamation.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DELIVERED:  April 14, 2016